*** Filed ***
01:28 AM, 13 Oct, 2026
U.S.D.C., Eastern District of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**LAWRENCE MEADOWS,**
Plaintiff,

**v.**

**ALLIED PILOTS ASSOCIATION,**
Defendant.

**CASE NO. 2:26-cv-00679-EK-ARL**
**HONORABLE JUDGE ERIC R. KOMITEE**
________________________________________/

**FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

**PRELIMINARY STATEMENT**

1. This is an action by Plaintiff Lawrence Meadows against Defendant Allied Pilots Association ("APA") for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"); breach of the Railway Labor Act ("RLA") duty of fair representation ("DFR") in the handling of Grievances 12-011, 12-012, and 23-031; interference with rights protected by Title I of the Labor-Management Reporting and Disclosure Act ("LMRDA"); and breach of contract of APA's Constitution and Bylaws. Plaintiff seeks relief only from APA in this amended complaint. The claims pleaded here arise from discrete and independently actionable events occurring after December 31, 2021. They are not an attempt to relitigate claims resolved, or facts excluded from consideration, in the Southern District of Florida action. The complaint also pleads the Railway Labor Act ("RLA") and breach-of-duty-of-fair-representation ("DFR") theories, including the statutory right of an individual grievant to pursue an available Board of Adjustment remedy when the union withdraws or extinguishes a grievance.

2. The case concerns APA's treatment of Plaintiff as a long-standing disabled pilot and union member, its handling of the RLA/DFR claims concerning Grievances 12-011, 12-012, and 23-031,

its withdrawal of union-funded legal representation in 2024, its participation in a January 15, 2025 settlement that Plaintiff alleges extinguished his grievance rights without notice and excluded him from relief, and its May 1, 2025 action terminating or denying his union membership. The post-2021 events include APA President Ed Sicher's September 2, 2022 constitutional interpretation; APA's 2023 conversion of Grievance 12-012 into expedited Grievance 23-031; APA's 2024 advancement of Grievance 12-011 and withdrawal of union-funded representation; the January 15, 2025 settlement; and APA's May 1, 2025 membership action. The pleaded factual sequence is intentionally dense because APA's defenses depend on contradictory classifications: Plaintiff is treated as administratively separated and removed from the pilots' seniority purposes, yet he has continuously remained on American Airlines' payroll and receives W-2 employee wages and collectively bargained benefits, continues to accrue pension credited service (longevity of service), and receives an active-pilot benefits package under the applicable plan documents.

3. Plaintiff alleges that APA's actions were connected to his protected advocacy, his filing and prosecution of legal proceedings, his efforts to expose representational failures, and his efforts to speak to APA's Board of Directors and membership about disabled pilots and the settlement.

4. Plaintiff does not name American Airlines, Nick Silva, Sue Edwards, or any Doe defendant in this amended complaint. References to them are factual allegations concerning APA's conduct, agents, motive, notice, causation, and damages. The RLA and DFR allegations concern APA's own representational obligations; the contract allegations concern APA's independent obligations under the APA Constitution and Bylaws ("C&B")

## PARTIES

5. Plaintiff Lawrence Meadows is an individual and former American Airlines pilot. Plaintiff is domiciled in Florida and currently resides in Miami Beach, Florida. Plaintiff previously lived,

worked, and maintained substantial personal and business connections in New York, including through his American Airlines employment and New York-area activities. Plaintiff used 2110 Jackson Avenue, Seaford, NY as a family-related address at the time of the original filing, but that address is not his current residence.

6. APA is an unincorporated labor organization and the certified representative of American Airlines pilots. APA's principal office is identified in its filings as being in Texas. APA also operates local domicile Chaired by two APA Board of Director Officers, with representational and committee structures serving hundreds of pilots in New York Tri-state area pilot crew bases at John F. Kennedy, LaGuardia, and Newark airports, referred to as the LaGuardia ("LGA") domicile.

7. APA is a labor organization within the meaning of the LMRDA and, to the extent applicable to the conduct alleged, a covered entity under the ADA.

## JURISDICTION AND VENUE

8. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the action arises under the ADA, 42 U.S.C. § 12101 et seq., and Title I of the LMRDA, 29 U.S.C. §§ 411 and 412. The Court has supplemental jurisdiction over related contract claims under 28 U.S.C. § 1367. The Florida action's December 31, 2021 temporal limitation was a discovery and case-management limitation in that action. It did not adjudicate the legality of the later acts pleaded here, and it did not determine whether APA's later membership interpretation, grievance advancement, settlement conduct, withdrawal of representation, or membership termination violated federal law or APA's contractual obligations.

9. Plaintiff invokes 29 U.S.C. § 412, which authorizes a member whose rights under Title I have been infringed to bring an action in the district where the alleged violation occurred or where

the labor organization has its principal office. Plaintiff also pleads that the New York contacts and agency allegations support jurisdiction for the ADA, RLA/DFR, and contract claims under the applicable jurisdictional statutes. He pleads transfer only as alternative relief and does not concede that transfer is required.

10. Plaintiff alleges that APA conducted relevant representational and governance activity through New York-area domicile officers, committees, and agents. APA's New York operations include local officers who represent pilots, participate in APA governance, and conduct union business.

11. On information and belief, James ("Jim") Clark served as APA's legal director or legal representative and acted as an APA agent in communications, decisions, and negotiations concerning Plaintiff. Clark is licensed in New York and maintains or operates through a New York law office in Northport, NY. Plaintiff alleges that Clark participated from New York in matters involving the withdrawal of APA-funded representation, the settlement negotiations, Plaintiff's grievances, and Plaintiff's membership status, including communications copying New York licensed attorney Sue Edwards after the settlement.

12. The New York facts are pleaded to the extent presently known and are subject to jurisdictional discovery.

13. Venue is proper under 28 U.S.C. § 1391 to the extent a substantial part of the events or resulting injury occurred in this District or through APA's New York agents and operations. If the Court concludes that a particular LMRDA claim belongs in Texas, Plaintiff requests transfer under 28 U.S.C. §§ 1404(a) or 1631 rather than dismissal with prejudice.

## **ADMINISTRATIVE PREREQUISITES**

14. Plaintiff filed a charge of discrimination naming APA with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 510-2026-02977. The charge and the Notice of Charge were provided to APA. The EEOC issued a Notice of Right to Sue dated December 30, 2025. Copies of the APA charge and the right-to-sue materials are attached as **Exhibit A.**

15. Plaintiff filed this action within the applicable period after the Notice of Right to Sue. The ADA claims are asserted against APA only and are limited to conduct independently attributable to APA.

## FACTUAL ALLEGATIONS

### A. Plaintiff's employment, disability, and membership

16. Plaintiff graduated cum laude from Embry-Riddle Aeronautical University in 1985 with a degree in Aeronautical Engineering and served honorably as a United States Air Force pilot, flying T-37 and T-38 training aircraft and serving as a C-9A aeromedical airlift aircraft commander and instructor pilot.

17. In October 1991, Plaintiff became an American Airlines pilot. He flew B-727, DC-10, MD-11, and B-777 aircraft and accrued more than thirty-four years of continuous credited service without a break in service. The original complaint's definitions are incorporated and as explcitly defined in the collectively bargained American Airlines' 2004 Pilot Long Term Disability Plan ("Plan") document and Pilot Retirement Benefit Program ("Program"): 1) "Employee" means a person on the Company or Related Employer payroll whose wages are subject to federal withholding; 2) "Pilot Employee" concerns an employee on the Pilot System Seniority List or an individual permitted to participate in the plan; and the 2) "Program" definition preserves participation for qualifying disability or retirement benefits

18. Plaintiff joined APA in 1991 and remained a member in good standing continuously thereafter. Plaintiff never voluntarily resigned from APA. Plaintiff alleges that APA President Keith Wilson's 2016 C&B Interpretation treated MDD pilots as inactive members in good standing, while subsequent President Dan Carey's October 2017 C&B Interpretation letter adopted the contrary "no standing" position based on *Valverde* arbitration decision. Thereafter, President Ed Sicher's September 2022 C&B Interpretation rescinded that position and clarified that Inactive Members like Plaintiff who were in good standing prior to inactive status—remained in good standing. The Sicher C&B interpretation was in effect while current APA President Silva denied Plaintiff's request to speak at the May 5, 2025 Board meeting and instead terminated Plaintiff as a member in good standing, These shifting interpretations are pleaded as evidence of APA's changing position, not as a request to relitigate the *Valverde* arbitration decisions—which the Sicher interpretation explicitly rescinded along with the previous Carey Interpretation.

19. APA never expelled or suspended Plaintiff after formal charges, notice, a hearing, and an appropriate proceeding under APA's Constitution and Bylaws. Plaintiff therefore alleges that he remained a member in good standing under the LMRDA, 29 U.S.C. § 402(o); which defines a member in good standing as a person who has fulfilled membership requirements and has neither voluntarily withdrawn nor been expelled or suspended after appropriate proceedings consistent with lawful constitutional provisions.

20. Plaintiff has an actual and/or perceived disability within the meaning of the ADA,

that is treated into full remission through FAA-approved mitigating measures and medication. Plaintiff has continuously held an FAA first-class airman's medical certificate since November 28, 2018.

21. Plaintiff is qualified to perform the essential functions of an airline pilot. Since 2018, he has held or maintained qualifications on the Boeing 777 and 787 and has worked as a Boeing and Atlas Air instructor pilot at Boeings Miami Flight Training Center.

22. Plaintiff had an incident-free commercial flying record, no pilot-certificate violations, no flight-training failures, and no employee discipline or performance issues of the type alleged by APA. Plaintiff also served as a Miami domicile long-term-disability coordinator and advocated for disabled pilots.

23. American Airlines and APA used the term "MDD" (Medical Disability Dropped from American Airlines' seniority list) for medically disabled pilots who were removed from the seniority list and administratively separated after exceeding five years on long-term disability. Plaintiff was one of the MDD pilots affected by that policy, and APA and Plaintiff protested that policy by filing collective (class-action) and individual grievances seeking reinstatement and seniority relief.

24. Plaintiff alleges that, based on discovery in litigation of similarly situated MDD pilot, *Wallace Preitz v. Allied Pilots. Assoc.* (EDPA, Case No. 17-cv-01166-MSG); approximately 241 MDD pilots were affected, that approximately 58 later obtained FAA medical certificates and sought return to the pilot list, and that Plaintiff, Kathy Emery, and Susan Twitchell were among the few who were not reinstated. Emery and Twitchell accepted monetary settlements that waived return-to-work rights; Plaintiff revoked his proposed settlement within the applicable revocation period and continued to seek reinstatement.

25. In a March 2019 presidential update to APA's Board of Directors, former President Dan Carey stated that, "First Officer Larry Meadows attained his FAA Class 1 [medical certificate] in

January and is the first pilot to my knowledge to be denied a return to Clive [Active] status from MDD."

**B. APA's treatment of disabled pilots and Plaintiff's protected advocacy**

26. Plaintiff advocated for himself and other disabled pilots through grievances, internal APA proceedings, federal litigation, administrative charges, union forums, communications with APA officers, and presentations or attempted presentations to APA governance bodies. Plaintiff's protected activity also included founding and operating the Disabled Airline Pilots Foundation, organizing billboard-truck campaigns at American and APA facilities, speaking at American Airlines' shareholder meetings, issuing press releases, intervening in bankruptcy-related proceedings, filing EEOC charges, and advocating through APA's virtual union-hall forums. These allegations are included to show notice, protected activity, and causation—not to enlarge the present claims indefinitely.

27. Plaintiff participated in or contributed to APA's member forums, including the predecessor "Challenge and Response" forum and the members-only electronic forum known as "The Line," which Plaintiff describes as a virtual union hall. Plaintiff also alleges that APA's historical response to disabled-pilot advocacy included the physical and virtual union-hall lockout litigated in *Meadows* and *Emery* as reported by the union watchdog group the Association for Union Democracy ("AUD") which published a national newsletter article document APA's lockout of its disabled pilot members, titled, **"Member Discussion Board closed off with No Explanation: 233 Disabled Pilots Barred from Allied Pilots Association website."**

28. Plaintiff and 950 other disabled pilots were denied or restricted from access to APA's physical and virtual union facilities. In litigation brought by similarly situated MDD pilot. *Kathy*

*Emery v. Allied Pilots Assoc.* (FLSD, Case No. 9:14-cv-80518-DTKH, ECF No. 159, Jan. 4, 2017), district court Judge Hurley court addressed the lockout of disabled pilots from a union forum and found an impermissible infringement of protected speech. The ruling was directed to the *Emery* in that case, but it directly cited a union hall posting made by Plaintiff Meadows as one of three examples of outspoken union members critical of APA's leadership; and went on to state, "the [AP] board member who raised the topic of the MDD pilots' postings was likely motivated by a desire to silence a group he viewed as combative and litigious…" APA's historical union hall lockouts of its disabled members provide context for Plaintiff's later claims but are not pleaded as the sole basis for the 2025 membership of restriction on disabled members' speech, assembly, and access to union governance. The Emery order is pleaded as comparator and notice evidence only. It addressed APA's exclusion of MDD pilots from Challenge & Response and held that policy impermissibly infringed § 411(a)(2). It also described Plaintiff's advocacy, his protected activity, and the disputed treatment of disabled pilots. The Emery judgment did not adjudicate Plaintiff's 2022–2025 claims.

29. Plaintiff's protected activity included opposing disability discrimination, advocating for disabled pilots, challenging APA's representational decisions, filing and prosecuting grievances, filing federal Sarbanes-Oxley, SEC, and Air-21 Whistleblower complaints related to American's "Pilot disability Nurse Case Management Cost Savings Reports" and APA's associated representational failures and abandonment of disabled pilots claims , filing lawsuits and appeals, pursuing EEOC remedies, and seeking to speak to APA's Board and membership about the settlement and membership treatment.

30. Plaintiff's legal proceedings against APA did not waive his rights as a union member. Plaintiff alleges that APA repeatedly treated his exercise of legal rights as a reason to withhold representational assistance and to treat him differently from similarly situated pilots.

**C. MDD comparators and retaliation for suing APA**

31. During a March 24, 2017 text message exchange, Plaintiff's union representative, APA Board officer and Miami Domcile Vice-chairman Ed Sicher, told him that former union insider and similarly situated MDD pilot Joe Barkate had received an assurance from then APA President Dan Carey with guarantee of reinstatement after obtaining his FAA medical certificate, while Plaintiff had not received the same assurance because Plaintiff had sued APA. See relevant text exchange is below:

> LM: Oh except for Barkate, you know the MDD pilot situated EXACTLY like me, but for the fact he hadn't even applied for a medical much less had one. Seriously, how do you justify that???
>
> ES: **<u>He hasn't sued the union</u>**
>
> LM: **There you go Ed. Once again you've just admitted that APA Is indeed treating me disparately simply because I sued the Union.**

32. Thereafter, on August 14 2019, Plaintiff's other local union representative, APA Domcile Chairman and APA Board Officer William Read's email communication further placed APA's national officers and board of directors ("NO-BOD") on notice that Plaintiff was being treated differently from similarly situated MDD pilot Joe Barkate because Plaintiff had sued APA. The communication admitted Plaintiff was being treated disparately for exercising his right to sue the union, that APA was not representing him, nor moving his individual grievance 12-011 forward, stating in relevant part:

> "I object that FO Barkate receives our full support with his return to service while FO **<u>Larry Meadows rots on the vine</u>** with a Class 1 medical and a 777 type rating. **<u>Larry sued the Company and APA as was his lawful right, and he's being</u>**

> **treated disparately for exercising that right**…**He's the only pilot with a class I medical who the company has either not returned to service or has agreed to an unknown settlement.**
>
> **APA claims we can not file a grievance on his behalf because we don't represent him anymore, yet Larry receives collectively bargained pay and benefits from AA. Yet APA has filed grievances for other inactive members in similar circumstances. Indeed, Larry has an existing grievance (12-11) that APA refuses to move forward…**I beseech the BOD and National Officers to fully and aggressively support Larry Meadows return to active service." [Emphasis added].
>
> (**Exhibit B**).

33. The Read communication is consistent with, and corroborates, the earlier Sicher communication. Plaintiff pleads both as contemporaneous evidence that APA decision-makers knew his protected litigation was being used as a basis for disparate grievance and reinstatement treatment.

34. APA representatives advocated for Barkate's—a former APA insider and committeeman— reinstatement and advanced his case while Plaintiff's reinstatement and Grievance 12-011 were left unresolved for years.

**D. APA membership interpretations and Plaintiff's good-standing status**

35. APA historically treated disabled pilots as members or members in good standing while they pursued disability-related rights and grievances. The historical record includes APA President Keith Wilson's June 30, 2016 interpretation treating MDD pilots as inactive members, APA President Carey's October 18, 2017 interpretation taking the contrary position that inactive members lacked good standing, and APA President Sicher's September 2, 2022 C&B Interpretation rescinding that position (**Exhibit C**). Sicher's interpretation states that only a member in good standing may be transferred to inactive status and that a member in good standing retains that status while current on applicable financial obligations. Plaintiff alleges that this later

interpretation materially changed the membership-status landscape after the Florida court's temporal cutoff of December 31, 2021.

36. In or about June 2016, an APA presidential interpretation characterized disabled pilots as inactive but in good standing. In or about October 2017, a subsequent interpretation disputed or narrowed that status and treated disabled pilots as inactive and not in good standing.

37. Between 2014-2017, Plaintiff pursued filed two separate APA C&B Article VII Charges against APA's President Wilson and Secretary Treasurer Pam Torell for their roles and actions related to the lockout of Plaintiff and other similarly situated disabled MDD pilots from APA's virtual and physical union hall. A prerequisite to filing these charges is that you must be a member in good standing. APA's own procedures and past practice recognized his participation in union governance and member forums.

38. On September 2, 2022, APA President Sicher issued a constitutional interpretation stating that pilots who had been in good standing before extended medical disability remained members in good standing while inactive. Plaintiff alleges that this interpretation confirmed and restored his membership status under APA's governing documents. The September C&B 2022 interpretation is a material post-cutoff change in circumstances. It expressly rescinded the earlier interpretation adopting the *Valverde* position and stated that an inactive member who was in good standing when becoming inactive retains good standing while inactive, subject to the stated financial qualifications. Plaintiff alleges this interpretation superseded the factual premise APA had relied upon in earlier proceedings.

39. Plaintiff alleges that APA thereafter treated him as a member for governance and committee purposes, and that President Sicher appointed him to the APA National Aeromedical Committee to serve as a Long Term Disabled ("LTD") Pilot Coordinator—member in good

standing status was prerequisite to hold that position—to assist other disabled pilots. Plaintiff remained a member of or participant in APA's National Aeromedical Committee or Disabled Pilots Awareness Subcommittee and served in a Miami domicile disability-related role before APA President Nick Silva's May 1, 2025 letter terminating Plaintiff's membership.

40. Notably, in January 2025, President Silva approved Plaintiff to speak at APA membership guest hour before the Board of Directors. After Plaintiff made multiple requests in April 2025 to speak at the May 5, 2025 APA Board of Directors Meeting concerning the settlement and disabled-pilot rights, and despite the Sicher C&B Interpretation remaining operative and unchanged, APA reversed course, and on May 1, 2025 President Silva response to those requests with the membership termination letter (**Exhibit D**). Plaintiff alleges that the close timing and unexplained change support pretext and retaliation for exercising his right to sue and file a motion to reopen his case against APA just two weeks prior.

41. Plaintiff was never delinquent and maintained the dues and membership requirements applicable to him, and access to union governance and forums, and received or relied on member benefits, including $1M of supplemental medical benefits—for which he paid premiums for twenty years and continue after retirement age—but for which he was rendered ineligible when Silva terminated his required member in good standing status.

**E. Grievance 12-011**

42. Grievance 12-011 is Plaintiff's individual grievance concerning reinstatement to the pilot seniority list, related assignment or return-to-work rights, and associated benefits (**Exhibit E**). The grievance also identified disability discrimination or retaliation as part of the circumstances

requiring APA representation.[1] The original complaint's authorities are incorporated here: *Stevens v. Teamsters Local 2707,* 504 F. Supp. 332, 336 (W.D. Wash. 1980) states that before a union withdraws a grievance without receiving anything for the employee, it must give notice of its intention to do so; *Smyj v. Consolidated Rail Corp.*; *Pyles v. United Air Lines, Inc*., 79 F.3d 1046, 1052 n.9 (11th Cir. 1996); *Pratt v. United Air Lines, Inc*., 468 F. Supp. 508, 513 (N.D. Cal. 1978); and *Bumpus v. Air Line Pilots Association*, 606 F. Supp. 3d 845, 857 (N.D. Ill. 2022). Plaintiff relies on these authorities for the limited proposition that a union may not act as an absolute gatekeeper by extinguishing an individual grievant's statutory remedy without notice and a meaningful opportunity to proceed individually at the grievant's own expense—as Plaintiff requested to do here.

43. August 14, 2019 APA Board-related email from Plaintiff's Miami domicile chairman, Captain William Read, was sent to APA national officers and the Board of Director, stated in relevant part**: "Indeed, Larry has an existing grievance (12-11) that APA refuses to move forward." (Exhibit B).** [Emphasis added]. That email is contemporaneous evidence that APA's own domicile representative understood Grievance 12-011 not closed and disposed in 2013 as falsely alleged by APA President Silva in the January 15, 2025 settlement agreement, and identified APA's refusal to advance it.

44. On June 13, 2024, Sicher directed APA's grievance department, including Director of Grievances Tricia Kennedy, to advance Grievance 12-011 to arbitration. Sicher later stated "that

---

[1] The grievance history includes preservation of Grievances 12-011 and 12-012 in the 2011 American Airlines' bankruptcy proceedings; and a subsequent September 2014 bankruptcy court order permitting Plaintiff to pursue 12-011 before the System Board; and later November 2021 order preserving those grievances when all of APA's other claims were discharged.

grievance was still open, active and in the queue for arbitration hearing at least until I left office on October 2024." (**Exhibit H**, Sicher Decl. ¶ 27).

45. APA did not provide Plaintiff with reliable notice that Grievance 12-011 remained open and pending or that it would be affected by the January 2025 settlement, which falsely states it was closed and disposed of since 2013. In fact, to date, APA has never provided Plaintiff a copy of the settlement agreement.

46. Plaintiff did not learn the reliable status of Grievance 12-011 until Sicher's January 28, 2026 declaration, shortly before Plaintiff filed this action. Plaintiff pleads delayed accrual, concealment, equitable tolling, and continuing breach in the alternative.

**F. Grievances 12-012 and 23-031**

47. Grievance 12-012 was a collective grievance concerning MDD pilots and seniority or reinstatement rights (**Exhibit F**). Plaintiff alleges that it covered him and that APA represented it as applying to the affected pilots. Sicher's supplemental declaration states that he converted 12-012 into 23-031 "for the express purpose of advancing Meadows' claim," (**Exhibit H**, Sicher Decl. ¶ 23). Plaintiff pleads this as evidence of "Rays of hope" and APA's RLA duty of fair representation owed him.

48. On or about March 13, 2023, Sicher converted or advanced Grievance 12-012 into expedited Presidential Grievance 23-031 (**Exhibit G**). Plaintiff alleges that 23-031 was the expedited successor or substantially identical version of 12-012 and was advanced for his benefit as an affected pilot. Sicher's declaration describes this as conversion for the express purpose of advancing Plaintiff's claim. (**Exhibit H,** Sicher Decl. ¶ 23). Sicher also created or supported the National Dropped Reinstatement Committee ("NDRC"), with Thomas Rempfer as Chairman, to investigate avenues for reinstatement and that the "Allied Pilots Association leaves no pilot

behind." "During the AOA Spring BOD Meeting, FO Rempfer presented the NDRC PowerPoint to the BOD, and APA Attorney Tricia Kennedy and Former APA BOD CA Thomas Westbrook attempted to orchestrate a recall of MDD advocate FO Rempfer." (**Exhibit H, Sicher Decl., ¶ 25**).

49. APA and American executed a settlement dated January 15, 2025 concerning 23-031 and 12-012. The settlement identified Plaintiff among the affected individuals but excluded him from comparable relief and purported to extinguish or close the grievances without providing Plaintiff notice or an opportunity to pursue them at his own expense. The January 15, 2025 settlement identified four affected individuals—Dale Churovich, Tim Curren, Roger Wagner, and Plaintiff—and treated them differently in the Return-to-work ("RTW") process. Plaintiff pleads the other individuals' circumstances only as comparator evidence.

50. The settlement stated or represented that Grievance 12-011 had been closed or disposed of in 2013. Plaintiff alleges that representation was inconsistent with the grievance's later advancement and pending status.

51. Plaintiff did not receive the settlement agreement directly from APA or American. Plaintiff first saw the official publicly docketed version when American filed it in the Eleventh Circuit record on October 6, 2025. *Meadows v. American Airlines,* No. 25-10297 (11th Cir.), Doc. 30 at 12–17. Neither APA nor American provided Plaintiff an official copy directly. Plaintiff alleges that the lack of notice and direct delivery delayed his ability to determine how the settlement affected Grievances 12-011, 12-012, and 23-031.

52. Plaintiff filed this action on February 6, 2026. He pleads that the claims concerning the settlement accrued when he received reliable notice, or are tolled by concealment, fraudulent nondisclosure, continuing breach, and APA's failure to provide the agreement.

**G. APA-funded representation of Plaintiff's ADA Suit and June 2024 withdrawal**

53. In approximately May 2024, Sicher authorized APA funding for attorney Sue Edwards to represent Plaintiff in disability-discrimination claims against American. Sicher's sworn testimony states that he signed or approved an APA authorization for expenditure ("AFE") and paid an initial retainer of approximately $10,000, followed by additional payments. (Exhibit H, Sicher Decl., ¶ 26; **Exhibit** I, Sicher Supp. Decl, ¶¶ 2-5).

54. Plaintiff provided Edwards with his work product, litigation strategy, factual materials, and mental impressions so that she could represent him. Edwards worked with or sought additional counsel in connection with the claims.

55. On or about June 13, 2024, Sicher demanded that Plaintiff withdraw or abandon his pending DFR litigation or otherwise stop pursuing the claims. Plaintiff requested written assurances concerning APA's obligations and refused to abandon his statutory rights without them.

56. On or about June 14, 2024, Sicher sent Plaintiff a hostile text or message and withdrew, abandoned, or caused APA to withdraw the representation. Plaintiff alleges the withdrawal was connected to pressure from APA's legal department or Board and to his refusal to abandon protected litigation. The contemporaneous message stated:

> "It's over Larry. **You're on your own.** **I'll drop your grievance.** **You can make the case that APA isn't advocating for you now. Treat the union as your enemy.**" It further stated: "I've given official word to Sue and Jim to expend no more resources on you." [Emphasis added].

57. Sicher's supplemental declaration supports the allegation that APA retained and signed an APA Authorized Financial Expenditure ("AFE") paying New York licensed attorney Sue Edwards a $10,000.00 to represent Plaintiff in his ADA lawsuit against American Airlines, and that Sicher acted as an APA officer with authority over the expenditure. (**Exhibit I**, Sicher Supp. Decl. ¶ 5).

58. Additionally, Sicher's Declaration also supports Plaintiff's allegations concerning preservation of  evidence and the absence of a litigation hold and the resultant spoliation of ESI and physical evidence. Sicher attests, "I was never instructed by APA counsel to preserve my emails, text messages, or other ES1 related to my union duties the with respect to Mr. Meadows, nor did l receive a litigation hold letter related to Mr. Meadows until months after I had left office in 2024, despite being notified by the Plaintiff that he sent preservation letters to APA as early as 2013." (*Id.* ¶ 2), and that because "I was under no instruction from  APA to preserve such communications, I routinely deleted text messages from my personal devices during my tenure as President." (*Id.* ¶ 3), and he further attested in October 2024 that he brought his laptop to "APA headquarters to be serviced, the hard drive was effectively wiped clean, rendering all stored data including emails and documents related to my duties as APA President permanently inaccessible to me from that device." (*Id.* ¶ 4).

59. Sicher also attested, that during his decade service as and APA Board Officer and President he kept "copious contemporaneous handwritten notes on standard yellow legal pads…" which "amounted to hundreds of individual legal pads…stored approximately five milk crates…labeled by topic, such as Meadows' litigation or matters related to the REDDI [Reinstatement of Disability Dropped Investigative] Committee." He went on to state that because "I was never instructed by APA's Lega; Department to reserve these materials, I discarded and destroyed all five crates of these handwritten notes…" shortly after he was removed from office in late 2024. (**Exhibit K**, Sicher Second Supp. Decl. ¶ 5).

60. These matters are pleaded here only insofar as they show notice, age6ncy, motive, and the factual basis for the grievance and membership claims (*Id.*).

**H. January 2025 settlement and May 2025 membership termination**

61. Plaintiff learned in January 2025 that APA and American had negotiated a settlement affecting the grievances and reinstatement of specific MDD pilots, that agreement explicitly defining and naming Plaintiff as one of the four "Identified Individuals" (**Exhibit J** at ¶¶ 1-2). Plaintiff Subsequently communicated with APA representatives, including Nick Silva and Jim Clark, concerning the settlement and the status of his grievances.

62. The settlement was signed by APA President Nick Silva, and its stated pretexts were that Plaintiff supposedly received individual notice. "in advance to his removal from the seniority list and separation from employment but admitted it that "notice may not have been compliant in form." as likely not compliant with the CBA; and that Grievance 12-011 had been disposed of and closed…2013. (*Id.* at 2 ¶ 2). Plaintiff alleges both premises were false or materially incomplete: the notice was not the CBA's required chief-pilot-supervisor disciplinary process, and Sicher's sworn account states that APA President Silva in the settlement "falsely claimed" that Plaintiff's individual Grievance 12-011 was "closed in 2013." Because that was the very same grievance Sicher ordered to arbitration in June 2024 and remained in the open and active in the arbitration queue in October 2024. (**Exhibit H**, Sicher Decl. ¶ 30.).

63. Plaintiff alleges the settlement was signed in secret between APA and American without notice to him, without a copy being provided by APA, and without a meaningful opportunity to pursue the grievances at his own expense. He first saw the official docketed version when American filed it in the Eleventh Circuit record on October 6, 2025. (*Id.*)

64. The settlement was executed while Plaintiff was not given notice, nor a copy of the settlement, a meaningful opportunity to participate, or an opportunity to pursue the grievance remedies independently. Plaintiff alleges that APA accepted a settlement that provided no value to him and extinguished rights that APA had previously represented as active or pending. The

settlement's stated pretexts were that Plaintiff supposedly had compliant individual notice and that Grievance 12-011 had been closed since 2013. Plaintiff alleges both premises were false or materially incomplete: the notice was not the CBA's required chief-pilot-supervisor disciplinary process, and Sicher's sworn account states that 12-011 was advanced in June 2024 and remained in the arbitration queue in October 2024.

**I. Post-2021 New Discrete Acts And Changed Circumstances**

65. Plaintiff sought to reopen or pursue related litigation in 2025 and intended to address APA's Board and membership concerning the settlement, disabled-pilot rights, and APA's representational obligations. These post-2021 facts are the independent "tips of the iceberg" identified in Plaintiff's Florida filings. They occurred after the Florida court's December 31, 2021 temporal cutoff, were not adjudicated on their merits in that action, and materially changed Plaintiff's membership, representational, and litigation position. The claims pleaded here arise principally from discrete acts occurring after that cutoff, including the September 2, 2022 Sicher interpretation, the 2023 conversion of Grievance 12-012 into Grievance 23-031 for Plaintiff's benefit, the June 2024 APA-funded retention of Sue Edwards to represent Plaintiff in his ADA lawsuit against American, and APA's advancement of Grievance 12-011.

66. The later acts also include the January 2025 settlement and May 2025 membership action. Former APA President Ed Sicher's second supplemental declaration provides additional sworn factual support concerning Plaintiff's membership status, grievance coverage, APA's later conduct, and evidence presented after the Florida court's temporal cutoff (**Exhibit K**, Sicher Second Supp. Decl., ¶¶ 3, 7-11). Plaintiff does not ask this Court to reopen or relitigate the Florida judgment. He alleges these later events as independent facts supporting the claims pleaded here.

67. On May 1, 2025, APA President Nick Silva sent Plaintiff a membership-termination or membership-status letter. The letter purported to terminate, suspend, or deny approximately thirty-four years of APA membership.

68. The May 2025 action deprived Plaintiff of access to union governance, the Board and membership, the Line and other member forums, union meetings, committee participation, and membership-dependent supplemental medical benefits.

69. APA did not provide Plaintiff with formal charges, a hearing, a meaningful opportunity to prepare, or a full and fair proceeding under APA's Constitution Article VII—as otherwise required by the LMRDA 29 U.S.C. § 411(a)(5)—or any other applicable APA constitutional provisions before imposing the action.

70. The timing followed Plaintiff's protected lawsuits—two weeks after he filed a motion to reopen the Florida case—grievance activity, communications with APA officers, and effort to expose the settlement during an APA national-officer election. Plaintiff alleges that the stated membership rationale was pretextual and that APA acted to punish or silence him.

**J. APA's Agency and New York Contacts**

71. APA's New York-area domicile has two local Board of Director Officers, serving as Domcile Chairman and Vice-Chairman, a local committee structure, performing representational functions for hundreds of pilots  or associated with New York airports. Those officers participate in APA governance and conduct union business on APA's behalf.

72. On information and belief, Clark performed APA legal work from New York and participated in decisions or negotiations concerning Sue Edward's role in negotiating the settlement, the settlement agreement, and Plaintiff's membership. APA controls the facts necessary to determine Clark's authority, work location, billing, and communications. Plaintiff

alleges on information and belief that Clark, a New York-licensed attorney operating through a New York law office, acted as APA's New York agent in directing or participating in the withdrawal of Sue Edwards—also a licensed New York-licensed attorney acting as APA's agent—the settlement negotiations, and related communications.

73. Plaintiff alleges these facts in good faith based on APA's organizational structure, Clark's known New York legal practice and coordination with Edwards, and the sequence of communications. Plaintiff requests jurisdictional discovery if APA contests the allegations.

74. Plaintiff pleads transfer as alternative relief because APA identifies Texas as its principal office and because the Court may determine that some LMRDA claims should proceed there.

**K. Pattern of Retaliation Documented by the Sworn Testimony of APA President Ed Sicher**

75. The following sequence is documented in the sworn declarations of former APA President Ed Sicher, attached as Exhibits H, I, and K:

(i) In March 2023, Sicher converted collective Grievance 12-012 into expedited Presidential Grievance 23-031 "for the express purpose of advancing Meadows' claim." (**Exhibit H**, Sicher Decl. ¶ 23).

(ii) Sicher created the National Dropped Reinstatement Committee, chaired by Thomas Rempfer, to find reinstatement avenues for MDD pilots under the principle that "the Allied Pilots Association leaves no pilot behind." Rempfer presented the committee's work to the Spring 2023 Board of Directors Meeting, after which APA representatives sought to remove or recall him. (*Id.*, ¶ 24).

(iii) In May 2024, Sicher signed an APA Authorized Financial Expenditure paying attorney Sue Edwards a $10,000 retainer to represent Plaintiff in his ADA lawsuit against American. (**Exhibit I**, Sicher Supp. Decl. ¶¶ 5).

(iv) On June 13, 2024, Sicher directed APA's grievance department, including Director of Grievances Tricia Kennedy, to advance Plaintiff's individual Grievance 12-011 to arbitration. **(Exhibit H**, Sicher Decl. ¶ 27).

(v) On June 14, 2024, after Plaintiff refused to abandon his pending DFR lawsuit, Sicher sent a hostile text stating: "It's over Larry. You're on your own. I'll drop your grievance. You can make the case that APA isn't advocating for you now. Treat the union as your enemy." It further stated: "I've given official word to Sue and Jim to expend no more resources on you."

(vi) In late September Sicher refused to what became the January 2025 secret settlement because **"it was a go-no-go decision point to leave any pilot behind."** (*Id.* ¶ 28).

(vii) In October 2024 during newly appointed APA President Silva's initial transfer-of-power meeting with Sicher, Silva's primary focus was questioning why Sicher had refused to sign the settlement that excluded Plaintiff. (*Id.*. ¶ 29).

(viii) Silva immediately after taking office disbanded the National Dropped Reinstatement Committee and purged its chairman, Thomas Rempfer, without notice. (*Id.* ¶ 29).

(ix) Silva sat on the settlement for three months, executing it on January 15, 2025, only after American obtained dismissal of Plaintiff's separate ADA lawsuit on December 30, 2024. (*Id.* ¶ 30).

(x) The settlement falsely declared Grievance 12-011 "closed since 2013," when Sicher's sworn account establishes it was advanced in June 2024 and remained in the arbitration queue as late as October 7, 2024. (*Id.* ¶ 30).

(xi) No litigation hold was ever issued. Sicher's laptop was wiped clean, his emails and texts were routinely deleted, and APA destroyed five milk crates containing over 300 legal pads of

his contemporaneous notes relating to ten years of union service. (**Exhibit I**, Sicher Supp. Decl. ¶ 5).

(xii) Sicher's second supplemental declaration corrects the magistrate's report, reaffirms that the September 2022 constitutional interpretation superseded the *Valverde* position, that APA's statement that Grievance 12-012 didn't apply to Plaintiff was false, and characterizes the settlement's statement that Grievance 12-011 "closed since 2013" language as a deliberate falsehood. (**Exhibit K**, Sicher Second Supp. Decl. ¶¶ 3, 7-11).

## CAUSES OF ACTION

### COUNT I — DISABILITY DISCRIMINATION (Violation of the ADA 42 U.S.C. §12112)

76. Plaintiff incorporates paragraphs 1 through 75.

77. APA is a covered entity to the extent it acted as an employer, labor organization, or other covered entity with respect to Plaintiff. Plaintiff is a qualified individual with a disability, was regarded or perceived as having a disability.

78. APA knew of Plaintiff's disability-related status, MDD history, medical certification, advocacy, and employment-related rights.

79. APA discriminated against Plaintiff through the withdrawal of representation, exclusionary grievance and settlement conduct, and membership-related consequences, including treating him less favorably than similarly situated MDD pilots because of actual or perceived disability.

80. APA's conduct caused economic, emotional, and other damages. This count is pleaded only to the extent the challenged conduct is independently actionable under the ADA.

### COUNT II — DISABILITY RETALIATION (Violation of the ADA 42 U.S.C. §12203)

81. Plaintiff incorporates paragraphs 1 through 80.

82. Plaintiff engaged in protected activity by opposing disability discrimination, advocating for disabled pilots, pursuing disability-related grievances, filing and prosecuting legal proceedings, communicating with APA about discrimination, and filing the EEOC charge.

83. APA knew of Plaintiff's protected activity. APA took materially adverse actions, including terminating or causing the termination of union-funded representation, excluding Plaintiff from grievance-related relief, and terminating or denying his membership after he sought to expose the settlement.

84. The timing, knowledge, comparator evidence, statements concerning Plaintiff's lawsuits, and sequence of acts support causation.

85. APA's retaliation caused damages and warrants injunctive and other relief permitted by law.

**COUNT III — BREACH OF DUTY OF FAIR REPRESENTATION:**

**GRIEVANCE 12-011 (Violation of RLA 45 U.S.C. § 151 *et. seq.*)**

86. Plaintiff incorporates paragraphs 1 through 85.

87. APA owed Plaintiff a duty of fair representation in the handling of Grievance 12-011 and was required to avoid arbitrary, discriminatory, and bad-faith conduct. Plaintiff also alleges that his relationship to APA's bargaining-unit representation is supported by APA's own conduct: APA advanced the collective Grievance 12-012 into 23-031 and later advanced Plaintiff's individual Grievance 12-011. In the alternative, Plaintiff alleges that APA's representational acts reattached any duty that APA claimed did not previously exist. Plaintiff does not rely on membership alone to establish the RLA/DFR claim.

88. APA failed to timely and fairly prosecute 12-011, misrepresented or concealed its status, and acted inconsistently with its later advancement of the grievance in 2024.

89. APA's conduct was arbitrary because it abandoned or withheld a grievance that APA representatives had recognized as a potential reinstatement remedy; discriminatory because Plaintiff was treated differently after suing APA; and in bad faith because APA concealed the grievance's status and later participated in a settlement that purported to close it.

90. The claim is timely or should be tolled because Plaintiff did not receive reliable information that 12-011 remained open and pending until January 28, 2026. Plaintiff pleads delayed accrual, concealment, equitable tolling, and continuing breach in the alternative.

## COUNT IV — BREACH OF DUTY OF FAIR REPRESENTATION: GRIEVANCES 12-012 AND 23-031 (Violation of RLA 45 U.S.C. § 151 *et. seq.*)

91. Plaintiff incorporates paragraphs 1 through 90.

92. APA owed Plaintiff a duty to fairly represent him in the collective and expedited grievances that sought reinstatement and seniority relief for MDD pilots, including Plaintiff. The same post-2021 conduct independently supports the DFR claim concerning 12-012 and 23-031. The claim is pleaded as a representational claim arising from APA's handling of grievances and settlement—not merely as a challenge to Plaintiff's membership status.

93. APA converted or advanced 12-012 as 23-031 and then participated in the January 15, 2025 settlement that excluded Plaintiff while identifying him as an affected individual.

94. APA acted arbitrarily, discriminatorily, and in bad faith by extinguishing or purporting to extinguish Plaintiff's grievance rights for no value, without notice, and without a meaningful opportunity to pursue the grievance independently.

95. The claim is timely or should be tolled because APA failed to provide the settlement and concealed the disposition. Plaintiff received no official copy until the October 6, 2025 Eleventh Circuit filing and filed this action on February 6, 2026.

**COUNT V — LMRDA EQUAL RIGHTS AND PRIVILEGES, 29 U.S.C. § 411(A)(1)**

96. Plaintiff incorporates paragraphs 1 through 95.

97. Plaintiff was a member in good standing within 29 U.S.C. § 402(o), or was entitled to be treated as such under APA's own September 2022 constitutional interpretation and governing practice. APA's September 2, 2022 interpretation is direct evidence of APA's own later position concerning inactive-member standing. It is inconsistent with APA's earlier 2017 position that Plaintiff lacked standing to file internal charges and supports Plaintiff's allegation that the May 2025 termination was a later, discrete change in position rather than a settled eligibility determination.

98. APA denied Plaintiff equal rights and privileges by terminating or denying his membership, excluding him from union governance and forums, removing him from committee participation, and depriving him of member-dependent benefits.

99. APA's action was connected to Plaintiff's protected litigation, advocacy, grievances, and effort to speak to the Board and membership. It was not a neutral application of a consistently enforced membership rule.

**COUNT VI — LMRDA SPEECH AND ASSEMBLY, 29 U.S.C. § 411(A)(2)**

100. Plaintiff incorporates paragraphs 1 through 99.

101. The Southern District of Florida's decision in *Emery v. Allied Pilots Association* (Case No. 14-80518-CIV-HURLEY), is pleaded as historical and comparative context. That court found that APA's policy denying MDD pilots access to the Challenge & Response virtual union hall violated 29 U.S.C. § 411(a)(2), and it treated the APA Constitution and Bylaws as the union's controlling document. Plaintiff does not contend that Emery adjudicated his later claims; he alleges that it

placed APA on notice of the legal significance of excluding disabled members from union forums and governance.

102. Plaintiff sought to speak, assemble, communicate with, and petition APA's Board and membership concerning the settlement, disabled-pilot rights, grievance handling, and APA governance.

103. APA's membership action and forum exclusion prevented or punished Plaintiff's protected speech and assembly and were motivated in part by his status as an outspoken critic and litigant.

104. APA's action chilled Plaintiff's ability to communicate with other members and participate in union governance.

**COUNT VII — LMRDA RIGHT TO SUE, 29 U.S.C. § 411(A)(4)**

105. Plaintiff incorporates paragraphs 1 through 104.

106. Plaintiff exercised the protected right to sue and to pursue legal proceedings concerning APA's representational failures, disability discrimination, grievance rights, and union-member rights.

107. APA retaliated against Plaintiff for exercising that right through the withdrawal of representation, disparate handling of his grievances, exclusion from settlement relief, and membership action.

108. Statements and communications distinguishing Plaintiff from Barkate because Plaintiff sued APA support causation.

**COUNT VIII — LMRDA UNLAWFUL UNION DISCIPLINE, 29 U.S.C. § 411(A)(5)**

109. Plaintiff incorporates paragraphs 1 through 108.

110. APA's May 1, 2025 action was disciplinary in substance because it terminated or suspended long-standing membership and imposed severe loss of rights and benefits after Plaintiff's protected conduct.

111. APA imposed the action without serving formal charges, providing reasonable time to prepare, or affording a full and fair hearing under APA's Constitution and Bylaws.

112. APA's stated eligibility rationale was pretextual or applied as punishment for Plaintiff's speech, litigation, and grievance activity.

## COUNT IX — BREACH OF CONTRACT: APA CONSTITUTION AND BYLAWS

113 Plaintiff incorporates paragraphs 1 through 112.

114. APA's Constitution and Bylaws are contractual rules governing membership, grievance representation, member rights, and APA's obligations to protect individual and collective rights and timely prosecute grievances. APA has previously treated its Constitution and Bylaws as a binding contract between APA and its members. The contract theory is pleaded separately and in the alternative because it concerns APA's independent constitutional and membership obligations, including its duty to protect individual and collective rights and to follow its own membership and discipline procedures.

115. Plaintiff does not plead the C&B counts as a disguised claim requiring interpretation of the collective bargaining agreement, and he does not seek duplicative recovery with the RLA/DFR counts. The C&B contract claims also concern independent membership, speech, governance, disability-protection, and anti-retaliation obligations—not only grievance handling. Plaintiff alleges that Article II obligations required APA to protect individual and collective member rights, including rights secured by the LMRDA, ADA, RLA, and applicable whistleblower laws including SOX, SEC, AIR-21 Acts. The contract counts are pleaded separately and in the alternative, without

seeking duplicative recovery, to address APA's contradictory positions that Plaintiff was not a bargaining-unit member but was still bound by APA's C&B.

116. APA breached those obligations by failing to protect and prosecute Plaintiff's grievances, participating in the settlement that excluded him, withdrawing or causing withdrawal of representation, and terminating membership without following required procedures.

117. Plaintiff pleads this count in the alternative to the RLA/DFR claims and does not seek duplicative recovery. APA may assert RLA preemption, but the claim concerns APA's independent constitutional and membership obligations and is pleaded alternatively.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this honorable Court enter judgment in his favor and against Defendant Allied Pilots Association and grant the following relief:

**A.** Declare Plaintiff's rights under the ADA, RLA, Title I of the LMRDA, and APA's Constitution and Bylaws;

**B.** Declare that APA's May 1, 2025 membership action was unlawful, retaliatory, and ineffective, and enjoin APA from enforcing it or denying Plaintiff membership rights without lawful charges, notice, and a fair proceeding;

**C.** Order APA to recognize Plaintiff as a member in good standing and restore his membership, governance, forum, committee, and related membership rights to the extent legally available;

**D.** Order APA, to the extent authorized by law, to process and pursue Plaintiff's rights concerning Grievances 12-011, 12-012, and 23-031 through lawful negotiation, arbitration, or other available RLA procedures. Plaintiff does not ask the Court to compel American Airlines to reinstate him without American's participation or legal authority;

**E.** Award all back pay, lost benefits, pension accrual, travel benefits, supplemental benefits, and other economic losses proven to have been caused by APA's unlawful conduct, under the ADA, LMRDA, RLA, and contract theories to the extent legally recoverable;

**F.** Award front pay, prospective economic relief, or other make-whole relief in lieu of reinstatement where reinstatement is unavailable or legally impracticable, subject to causation, mitigation, applicable limitations, and no double recovery;

**G.** Award compensatory, statutory, equitable, punitive, emotional-distress, and other damages where authorized by law, in amounts to be proven at trial;

**H.** Award costs, interest, and attorney's fees or litigation expenses only to the extent authorized by applicable law;

**I.** If any claim cannot properly proceed in this District, transfer that claim under 28 U.S.C. §§ 1404(a) or 1631 rather than dismissing it with prejudice; and

**J.** Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

**VERIFICATION**

I, Lawrence Meadows, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified First Amended Complaint, that the factual allegations are true and correct to the best of my knowledge, information, and belief, and that any matters stated on information and belief are believed to be true.

Executed on October 13, 2026

L. M. Meadows

______________________
Lawrence M. Meadows
Plaintiff, Pro Se

Dated: October 13, 2026

Respectfully submitted,

______________________________

Lawrence M. Meadows, Plaintiff
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Telephone: (516) 982-7718
Email: lawrencemeadows@yahoo.com

**CERTIFICATE OF SERVICE**

I, Lawrence M. Meadows, hereby certify that on October 13, 2026, I filed the foregoing via the Court's CM/ECF Pro Se Portal, which will cause a Notice of Electronic Filing (NEF) to be sent to all registered counsel of record, and also served the same via email and U.S. Mail.



Lawrence M. Meadows
Plaintiff, Pro Se

**Service List**

**Joshua Shiffrin**
**John M. Pellettieri**
**Lloyd M. Shadgett**
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C. 20005
jshiffrin@bredhoff.com
lshadgett@bredhoff.com
jpellettieri@bredhoff.com

*Counsel for Defendants Allied Pilots Association*

## EXHIBIT LIST

**Exhibit A:** Notice of Right to Sue, Notice of Charge, and underlying EEOC charge.

**Exhibit B:** August 14, 2019 APA Board Officer William Read email concerning Joe Barkate, Plaintiff, and Grievance 12-011.

**Exhibit C**: September 2, 2022 Sicher Presidential Constitutional Interpretation.

**Exhibit D**: May 1, 2025 membership-termination letter signed by APA President Nick Silva.

**Exhibit E**: Meadows Individual Reinstatement Grievance 12-011.

**Exhibit F**: APA Collective (class-action) Reinstatement Grievance 12-012 on behalf of Meadows and other MDD pilots.

**Exhibit G**: Sicher Expedited Presidential Grievance 23-031 and 12-012 conversion letter.

**Exhibit H**: Docket-stamped Sicher declaration dated January 28, 2026, without its attached exhibits.

**Exhibit I**: Docket-stamped Sicher Supplemental Declaration dated January 29, 2026, without its attached exhibits.

**Exhibit J**: Official January 15, 2025 settlement agreement version filed in the Eleventh Circuit record.

**Exhibit K**: Docket-stamped Sicher second supplemental declaration dated May 29, 2026, w without its attached exhibits.

# **EXHIBIT A**

## **To Plaintiff's First Amended Verified Complaint**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Miami District Office**
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 12/30/2025

**To:** Lawrence Meadow
1900 Sunset Harbour Drive, #2112
Miami Beach, FL 33139
Charge No: 510-2026-02977

EEOC Representative and email: MAXIMILIAN FEIGE
ENFORCEMENT SUPERVISOR
MAX.FEIGE@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 510-2026-02977.

On behalf of the Commission,

Digitally Signed By:Evangeline Hawthorne
12/30/2025

Evangeline Hawthorne
Director

**Cc:** Allied Pilots Assoc.
NA NA
14600 TRINITY BLVD STE 500
FORT WORTH, TX 76155

Please retain this Notice for your records.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Miami District Office**
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## NOTICE OF CHARGE OF DISCRIMINATION

(This Notice replaces EEOC FORM 131)

12/30/2025

**To:** ALLIED PILOTS ASSOCIATION
14600 TRINITY BLVD STE 500

FORT WORTH, TX 76155, UNITED STATES OF AMERICA

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Lawrence Meadow under: The Americans With Disabilities Act of 1990 (ADA). The circumstances of the alleged discrimination are based on Disability, Retaliation, and involve issues of Reasonable Accommodation, Hiring, Reinstatement/Recall from Layoff, Terms/Conditions, Harassment, Union Representation that are alleged to have occurred on or about 12/30/2025.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, the EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access the EEOC's secured online system at https://arc.eeoc.gov/rsp/login.jsf
2. Enter this EEOC Charge No.: 510-2026-02977
3. Enter this password: MPhmKsqvT

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding it, you may send an email to MiamiDigital@eeoc.gov.

## Preservation of Records Requirement When a Charge has Been Filed

The EEOC regulations require respondents to preserve all payroll and personnel records relevant to the charge until final disposition of the charge or litigation. 29 CFR §1602.14. For more information on your obligation to preserve records, see https://www.eeoc.gov/employers/recordkeeping-requirements.

## Non-Retaliation Requirements

The laws enforced by the EEOC prohibit retaliation against any individual because s/he has filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under these laws. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify the EEOC if any attempt at retaliation is made. For more information, see http://www.eeoc.gov/laws/types/facts-retal.cfm.

## Legal Representation

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please provide the attorney's contact information when you log in to the online system.

Please retain this notice for your records.

## CHARGE OF DISCRIMINATION

This is a charge of employment discrimination under the Americans with Disabilities Act (ADA) and other applicable statutes.

**AGENCY:**
Equal Employment Opportunity Commission (EEOC)

**EEOC CHARGE NOs.: 510-2026-02977 (Allied Pilots Association)**
**510-2026-02978 (American Airlines, Inc.)**

### 1. COMPLAINANT / CHARGING PARTY

- **Name:** Lawrence Meadows
- **Address:** 1900 Sunset Harbour Drive, #2112, Miami Beach, FL 33139
- **Telephone:** (516) 982-7718
- **Email:** lawrencemeadows@yahoo.com

### 2. NAMED RESPONDENTS (THE PARTIES WHO DISCRIMINATED AGAINST ME)

### A. Allied Pilots Association ("APA")

- **Address:** 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155
- **Telephone:** (817) 302-2272

### B. American Airlines, Inc. ("American")

- **Address:** 1 Skyview Drive, Fort Worth, TX 76155 (Headquarters)
- **Registered Agent:** Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701

### 3. CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

- RETALIATION
- DISABILITY

### 4. DATE(S) DISCRIMINATION TOOK PLACE

- **Earliest:** January 1, 2009
- **Latest:** December 23, 2025
- **[X] Continuing Action**

### 5. THE PARTICULARS ARE:

## I. Introduction & Charging Party

I am a former veteran and military pilot, multiple type-rated airline pilot, and a long-standing member of the Allied Pilots Association ("APA"), the collective bargaining representative for pilots at American Airlines, Inc. ("American"). I was formerly on long-term disability and am classified by APA as a Medically Disability Dropped from American Airlines Seniority List ("MDD") pilot, I am now fully medically recertified by the Federal Aviation Administration ("FAA") and qualified to work as an airline pilot, current and qualified as a Boeing B-777 Captain and Instructor Pilot, who meets all Essential Job Functions of an American Airlines Pilot. This charge details a continuous, ongoing pattern of disability discrimination and retaliation against me by both APA and American, culminating in their recent actions to extinguish my collectively bargained seniority rights and unlawfully terminate my union membership.

## II. Summary of Charges

I allege that APA has breached its statutory duty of fair representation and that both APA and American have engaged in a coordinated, years-long campaign of disability discrimination and retaliation against me. This campaign is a direct result of my protected activities, which include my advocacy for disabled pilots and my successful legal challenges against both entities. Their actions violate the Americans with Disabilities Act ("ADA") and the Labor-Management Reporting and Disclosure Act ("LMRDA"). The most recent retaliatory acts occurred in 2024 and 2025 and are part of a continuing violation that makes this charge timely.

## III. History of My Protected Activity

For over a decade, I have engaged in protected activities by opposing practices made unlawful by the ADA and advocating for the rights of myself and other disabled pilots. Both the APA and American have been fully aware of my protected advocacy at all relevant times. This has made me a target for both APA and American. My protected activities include, but are not limited to:

**A.** Prosecuting grievances that explicitly alleged disability discrimination and retaliation, including my individual Grievance 12-011 and collective Grievance 12-012, which both sought seniority reinstament after being removed from the seniority list for being on long term disability. Under federal case law, a grievance alleging employment discrimination is itself a form of protected activity. *See, e.g., Batuyong v. Gates*, 337 F. App'x 451, 456 (6th Cir. 2009).

**B.** Filing and prosecuting multiple federal lawsuits against APA to challenge its discriminatory practices and breaches of its duty of fair representation, in connection with their handling of my and other disabled pilots' grievances and rights.

**C.** Serving as a vocal and persistent advocate for the rights of disabled and MDD pilots within APA, publicly criticizing APA leadership for its failure to represent our interests, which resulted in APA locking out myself an all other similarly situated pilots from the virtual and physical union hall.

**D.** Serving as the founder of the **Disabled Airline Pilots Foundation** (DisabledAirlinePilotsFoundation.com), an organization created to advocate on behalf of myself and other similarly situated disabled pilots at American Airlines who have been subjected to discriminatory and treatment.

**E.** Directly opposing and intervening in the **American Airlines bankruptcy proceedings**. I filed two federal appeals to ensure that the nationwide EEOC Consent Decree, settling claims of a pattern or practice of disability discrimination and retaliation from 2009 to 2015, included and protected the rights of pilots at American Airlines. My successful advocacy delayed the confirmation of American's bankruptcy plan by approximately two years, drawing the sustained ire of both American and APA leadership.

**IV. The Discriminatory and Retaliatory Acts**

In retaliation for my protected activities, and because of my disability status, APA and American have engaged in a continuous series of adverse actions designed to destroy my career and silence my advocacy. These acts include:

**A. Breach of Duty of Fair Representation/Abandonment of Representation:** APA has deliberately and in bad faith mishandled, delayed, and ultimately abandoned my meritorious grievances related to my seniority rights and right to reinstatement, in stark contrast to its treatment of pilots who have not engaged in protected activity, leaving me as the only formerly disabled American pilot to be denied seniority reinstament and return-to work, who hasn't waived such right via a settlement.

**B. Discriminatory Failure to Reinstate:** American, in concert with APA, has refused to reinstate me to my rightful position as an active line pilot, despite my having obtained all necessary FAA medical certifications. This is in direct contrast to scores of other MDD pilots who were reinstated, making me the only qualified MDD pilot who engaged in protected activity to be permanently denied reinstatement.

**C. Secret Settlement to Extinguish My Rights:**

1. On or about **January 15, 2025**, APA under its newly board appointed President Nick Silva, entered into a secret settlement agreement with American Airlines, that resolved the very grievances at issue in my federal lawsuit. This agreement resolved Presidential Expedited Grievance 23-031 (the successor twin verbatim fast-tracked conversion of the long-pending collective disabled pilot seniority reinstatement Grievance 12-012, which American admitted applied to me specifically in its bankruptcy court pleadings) and provided for the reinstatement of three other similarly situated formerly disabled MDD pilots; but explicitly and discriminatorily carved me out, extinguishing my claims "with prejudice" and without notice, consent, or compensation.

2. This settlement agreement explicitly named as an "Identified Individual", but carved me out and excluded me from seniority reinstament, extinguishing my grievance rights "with prejudice" and for zero value and no notice. APA never provided a copy of this agreement, and I only obtained a copy of it from an external source in **mid-March 2025**. I was shocked when I read the language of the agreement and its disparate treatment of myself, as compared to the three other similarly situated former disabled pilots whose seniority was reinstated and returned to training for active line pilot service, one of whom was on disability for 24-years. I believe this exclusion was in direct retaliation for my long history of protected ADA-related activity on behalf of myself and other similarly situated long term disabled pilots.

3. The retaliatory motive for my exclusion is further evidenced by the settlement agreement's own pretextual and false assertion that my individual Grievance 12-11 had been "closed since 2013." This is demonstrably false. Grievance 12-11 was expressly preserved by the U.S. Bankruptcy Court in November 2021, and former APA President Captain Ed Sicher was began actively moving it toward arbitration on June 13, 2024, and it was in the que to be heard as late as October 7, 2024, right before Captain Sicher was summarily recalled and purged from his position as APA President, shortly after refusing to sign the secret settlement that excluded me from seniority reinstatement. This false statement was manufactured to justify my exclusion. This collusive act was a direct and malicious retaliation for my protected activity and pending federal lawsuit against APA.

**D. Retaliatory Termination of Union Membership:**

1. On or about **May 1, 2025**, just **two days** after I filed a motion to reopen my pending federal duty of fair representation lawsuit against the APA, and five days before I asked the address the May APA Spring Board of Directors during membership guest hour to expose the secret a settlement and its abrogation of seniority rights, APA President Nick Silva summarily terminated my 34-year union membership by letter sent via email. I was immediately locked out of the APA website, the virtual and physical union hall, and stripped of APA supplemental medical benefits(which continued into retirement) to which I paid premiums for over 20-years.This action was taken without cause and without any of the due process required by the APA's own Constitution & Bylaws.

2. I believe this termination of my membership was a further blatant targeted act of retaliation designed to punish me for my protected activity of exercising my right to sue the union and to silence my advocacy for disabled pilots, in direct violation of the ADA's anti-retaliation provisions, 42 U.S.C. § 12203.

**E. Ongoing Retaliatory Obstruction of Justice:** In my current federal lawsuit, *Meadows v. APA*, No. 1:17-cv-22589-EA (S.D. Fla.), APA's counsel continues its retaliatory campaign by systematically obstructing discovery. They have refused to produce key documents, violated federal rules regarding expert disclosures, and engaged in bad-faith gamesmanship to prevent the deposition of their corporate representative, all in an effort to prevent me from vindicating my rights in court.

## V. Continuing Violation

The actions described above are not isolated incidents but are part of an unbroken chain of discriminatory and retaliatory conduct stretching back over a decade and continuing to this day. The most recent adverse actions in 2025 are directly linked to and are the culmination of the Respondents' long-standing animus toward me for my protected activities.

## VI. Conclusion

For all the foregoing reasons, I believe APA and American has unlawfully retaliated and discriminated against me in violation of the Americans with Disabilities Act by excluding me from the January 15, 2025 settlement using a false pretext, and by terminating my union membership on May 1, 2025. Furthermore, I believe I have been treated differently on the basis of my disability. I am aware of statements made by senior airline executives, in the presence of APA leadership, expressing specific concern about reinstating pilots with psychiatric conditions, like my own. The differential treatment of my case compared to other former disabled pilots reinstated (two of whom were out on disability for 24-years) under the January 2025 secret settlement agreement supports an inference of disability discrimination and retaliation

## IV. Request for Relief

Given that I am less than three years form the FAA mandatory retirement age of 65-years – time is of the essence. I request that the EEOC provide and immediate right to sue and/or investigate this charge and that I be granted full "make-whole" relief, including but not limited to: reinstatement of my union membership, an order compelling the APA to secure my seniority reinstatement with American Airlines, back pay, front pay, compensatory damages for emotional distress, punitive damages, and any other relief the Commission deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

**Lawrence M. Meadows**
Dated: December 30, 2025

# EXHIBIT B

## To Plaintiff's First Amended Verified Complaint

**From:** WILLIAM READ <billyray2@bellsouth.net>
**Sent:** Wed, 14 Aug 2019 14:40:02 +0000 (GMT)
**To:** "Baker, Robert (Rob)" <rbaker@alliedpilots.org>
**Cc:** NO-BOD <NO-BOD@alliedpilots.org>; President <president@alliedpilots.org>
**Subject:** Re: Joe Barkate Seniority Reinstatement

---

I object that FO Barkate receives our full support with his return to service while we stand by quietly as FO Larry Meadow rots on the vine with a class 1 medical and a current 777 type rating. Larry sued the company and the APA, as is his lawful right, and he's being disparately treated for exercising that right. It's true that Dan asked management for Larry's return and Eric has as well… We asked and they said no. Put yourselves in Larry's shoes. He's the only pilot with a class 1 medical who the company has either not returned to service or has agreed to an unknown settlement.

APA claims we can not file a grievance on his behalf because we don't represent him anymore, yet Larry receives collectively bargained pay and benefits from AA. Yet APA has filed grievances for other inactive members in similar circumstances. Indeed, Larry has an existing grievance (12-11) that APA refuses to move forward. Admittedly, there's more to the story, but I beseech the BOD and National Officers to fully and aggressively support Larry Meadows' return to active service.

One for all and all for one.

BR

> On Aug 13, 2019, at 2:50 PM, Baker, Robert (Rob) <rbaker@alliedpilots.org> wrote:
>
> No objection,
>
> Rob
>
>> On Aug 13, 2019, at 12:51, President <president@alliedpilots.org> wrote:
>>
>> Gentlemen,
>>
>> Please see message below and attachments related to the reinstatement to the seniority list for FO Joe Barkate.
>>
>> Thank you for your consideration,
>>
>> Eric Ferguson
>>
>> w 817-302-2115
>> c 817-437-6929
>> President@alliedpilots.org
>>
>> *This email was drafted and sent from my cell phone. Please excuse grammar or formatting errors. The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.*
>>
>> -------- Original message --------
>> From: "Myers, Mark" <mmyers@alliedpilots.org>
>> Date: 8/12/19 19:50 (GMT-06:00)
>> To: President <president@alliedpilots.org>, Vice President <vice-president@alliedpilots.org>, SECRETARY-TREASURER <secretary-treasurer@alliedpilots.org>
>> Cc: "Clark, James (Jim) (Cnt)" <jim@jpclarklaw.com>, "Early, Clint" <cearly@alliedpilots.org>, "Papadopoulos, Christina" <cpapadopoulos@alliedpilots.org>
>> Subject: Joe Barkate Seniority Reinstatement
>>
>> Eric,

**ATTORNEY-CLIENT PRIVILEGED**

# ATTORNEY-CLIENT PRIVILEGED


Mark R. Myers

Attorney

Director, Pilot Negotiation and Contract Administration

Allied Pilots Association

14600 Trinity Blvd., Suite 500

Fort Worth, Texas 76155-2512

817.302.2340; 817.302.2181 (direct)

800.323.1470, ext. 2340

817.302.2187 (Fax)

mmyers@alliedpilots.org


cid:AAE6CD18-5E1B-477C-A069-


Confidentiality Notice: This email is not encrypted. However, the email may be confidential and may be privileged, and it is for the sole use of the named and intended recipient. Any review by or distribution to others is not authorized and may be illegal. If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please delete all copies received and notify the sender or the receptionist of APA Legal immediately at (817) 302-2170.


<R2014-07 Rev 1 Reinstatement Resolution 20MAR14.pdf><Barkate BOD Narrative 20190812.pdf>

# **EXHIBIT C**

## **To Plaintiff's First Amended Verified Complaint**

ALLIED PILOTS ASSOCIATION
Representing the pilots of American Airlines
O'Connell Building • 14600 Trinity Boulevard, Suite 500, Fort Worth, TX 76155-2512 • 817.302.2270 • www.alliedpilots.org

From: CA Ed Sicher, APA President

Date: September 2, 2022

Re: Presidential Constitutional Interpretation, Inactive Member Standing

The Allied Pilots Association Constitution and Bylaws (C&B) gives the President the authority to "enforce" the C&B and issue "written interpretations" thereof. *See* Article IV, Section 8.A.3. A question has arisen as to the standing afforded to Inactive Members.

**Article III.2.D**

D. Inactive Membership shall be assigned to flight deck operating crew members (including Check Airmen) who have completed the probationary period and meet the qualifications set forth in Article III, Section 1A, upon application and approval. Pilots in the following employment statuses shall be eligible for inactive membership: *(06/07/2006)*

1. Furlough
2. Medical or Personal Leave of Absence
3. Military Leave of Absence
4. Pilots not on active flying status with AA concurrently owing back dues. *(02/28/2008)*

Inactive Member. A member in good standing shall automatically be transferred to inactive membership status upon: *(02/25/99)*

1. Being furloughed by the Company.
2. Being on leave of absence from the Company thirty-six (36) months after the expiration of paid sick leave, or *(11/02/2018, R2018-45 Rev 2)*
3. Being in the United States military forces on continuous active duty in excess of sixty (60) months. *(02/28/2008)*
4. When that pilot is not on active flying status with AA and that pilot owes back dues, that pilot will remain on inactive membership status until he/she returns to work at AA. At that time, he/she will resume payment of back dues and will be returned to active membership. *(02/28/2008)*

**Article III.5.A**

**Section 5. Membership Status**

A. A member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association. The Secretary-Treasurer shall transfer a member from good to bad standing if such member shall be delinquent in either dues, assessments or other financial obligations due to the Association. A member will be placed in inactive

membership status by the APA Secretary-Treasurer when that member owes back dues and is not on active flying status. *(03/18/2011)*

**Interpretation**

Prior to October 2017, Inactive Members who were members in good standing at the time that they became inactive retained their good standing while in Inactive Member status. Following an arbitration award in the matter of *Meadows v. Wilson*, in which the arbitrator found that Inactive Members have no standing, neither good or bad, a Presidential constitutional interpretation was issued adopting that same position. For the reasons set forth below, I hereby rescind that interpretation and issue the following interpretation:

Article III, Section 2.A of the Constitution & By-Laws provides that "[a] member in good standing shall automatically be transferred to inactive membership status upon the occurrence of one of the specifically identified events therein. Article III, Section 5.A of the Constitution & By-Laws provides that "[a] member in good standing shall remain a member in good standing as long as such member has paid current dues, assessments or other financial obligations due to the Association."

Per Article III.2.A, only a member in good standing may be transferred to inactive membership status. As a result, at the time a member is transferred to inactive status, he or she must be in good standing. Article III.5.A provides that a member in good standing shall remain in good standing "as long as such member has paid current dues, assessments or other financial obligations due to the Association." Inactive Members do not receive compensation from American Airlines and thus do not have any ongoing dues, assessments or other financial obligations to the Association while they are in inactive status.

The C&B clearly provides that an Inactive Member must be a member in good standing at the time he/she becomes an Inactive Member. The C&B further provides that a member in good standing shall retain such standing as long as the member is current on all financial obligations to the Association. Because Inactive Members have no ongoing financial obligations to the Association while in such status, it is my interpretation that under the relevant provisions of the Constitution & By-Laws, Inactive Members, other than those who owed back dues at the time they went into inactive status, retain their good standing while in Inactive Member status.

This interpretation is solely intended to address the issue of standing of Inactive Members and does not bestow or vest any rights or privileges not already provide by the APA Constitution & By-Laws or APA benefit plans.

# <u>EXHIBIT  D</u>

## <u>To Plaintiff's First Amended Verified Complaint</u>

**ALLIED PILOTS ASSOCIATION**
*Representing the pilots of American Airlines*
O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

May 1, 2025

CA Lawrence Meadows
*Via Electronic Mail*

Dear Mr. Meadows,

It has been brought to my attention that you have requested to be included as a speaker during the Membership/Guest hour at the upcoming Spring Board of Directors meeting as a "member in good standing" of the Association.

As has been recently reaffirmed by the United States District Court for the Southern District of Florida, you were terminated from your employment as a pilot with American Airlines in 2011 pursuant to the terms of the Pilot Collective Bargaining Agreement. Following your termination by American, you were converted to Inactive Member status based on the fact that you were dropped from the seniority list, and thus terminated, due to having been out for more than five years due to a disability.

In 2018, you were able to obtain a first-class medical certificate and sought reinstatement to your position as a pilot with American Airlines. APA supported your request for reinstatement in accordance with its established protocols for seeking reinstatement for MDD pilots who regained their medical certificates. As you are aware, the decision to reinstate a pilot to employment is solely within the discretion of the Company and MDD pilots have no right to reinstatement. As you alleged in your recent lawsuit against the Company, American denied your request for reinstatement in 2019.

In light of the fact that you have not been employed by American Airlines as a flight deck crewmember since 2011 and then subsequently sought and were denied reinstatement by the Company after regaining your first class medical certificate, you are not qualified to retain any membership status in APA under Article III of our Constitution & Bylaws. Accordingly, you are not a member of APA, and you are thus not eligible to speak as a member during the membership hour of the upcoming Board of Directors meeting.

Respectfully,

First Officer Nick Silva
President, Allied Pilots Association

# EXHIBIT E

## To Plaintiff's First Amended Verified Complaint

**GRIEVANCE 12-011**

**Lawrence Meadows/AA#332713** **4Feb12**
**Po Box 4344**
**Park City, UT 84060**

**Captain Robert Raleigh**
**MIA Chief Pilot**
**MIA Intl Airport/Concourse D/Level 3/MD 2030**
**Miami, FL 33152**

**Sent via e-mail and certified mail:**

Dear Captain Hale,

I'm writing to grieve the improper assertions and actions, made via e-mail by Scott Hansen, Director HQD Flight Administration with respect to my employment status, seniority, and discharge. For the record I have never been contacted by, nor received any formal notice from my supervisor MIA Chief Pilot Raleigh, with respect to any of the above. Keep in mind I have a disability that affords me rights and protections under the American with Disabilities Act (ADA). Moreover, on 6Dec11 the company acknowledged such when they re-approved my Pilot Long Term Disability benefits.

In Blatant violation of the ADA, I was unilaterally removed me from the pilot seniority list, and discharged from American Airlines, not by my supervisor, but instead by the Mr. Hansen; who also denied me additional sick leave as a reasonable accommodation. Notwithstanding the fact that the "EEOC Enforcement guidance on the ADA and Psychiatric Disabilities, Para. 29", clearly states the *"No-Leave" policies* (such as the company's 5 years max sick leave rule) are *strictly prohibited.* Instead, I should have been granted additional leave as a reasonable accommodation, as long as necessary to meet the medical requirements of my job. In the interim the company is required to keep my same job, and position (i.e., seniority) open, until I'm able to return to work.

Furthermore, I protected then, as I am now as a Federal Whistle Blower. Yet Mr. Hansen, acting in a non-supervisory capacity asserted that he revoked my seniority and discharged me from the company; which constitutes a blatant violation of my rights and protections under federal law:

**Sarbanes–Oxley Section 1107: Criminal penalties for retaliation against whistleblowers:**
*"Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any federal offense, shall be fined under this title, imprisoned not more than 10 years, or both."*

Therefore as provided under Section 21 of the Pilots CBA, Section Please consider this my formal request for grievance on the above matter.

Sincerely,

L. M. Meadows

Lawrence Meadows/ 777FO MIA

# <u>EXHIBIT F</u>

## <u>To Plaintiff's First Amended Verified Complaint</u>

ALLIED PILOTS ASSOCIATION

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

May 22, 2012

VIA CERTIFIED MAIL, RETURN RECEIPT
REQUESTED # 7011 0470 0000 9113 1546

Captain John Hale
Vice President Flight
American Airlines, Inc.
P. O. Box 619617 MD851
DFW Airport, TX 75261-9617

Re: DFW Domicile Grievance No. 12-012

Dear Captain Hale:

Pursuant to the May 1, 2003, Agreement ("Agreement"), between American Airlines, Inc., and the airline pilots in its employ, as represented by Allied Pilots Association, the undersigned hereby file this grievance, on behalf of all DFW-based pilots protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

In accordance with Section 21.F.3 of the Agreement, I hereby elect to waive the Initial Hearing in this matter so that an Appeal Hearing can be held at the earliest possible date.

In addition, we request that the Company send a copy of all hearing notices and decisions rendered in this case to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155-2512.

Sincerely,

Captain Rusty McDaniels
Chairman - DFW

First Officer Russell Moore
Vice Chairman - DFW

cc: Ms. Reagan Heine, AA Specialist HR Ops Support (via Shelley Handman)
Captain Tom Kachmar, Grievance Coordinator – DFW
First Officer Neil Roghair, Negotiating Committee Chairman
Captain Frank McGill, Contract Compliance Committee Chairman
APA Legal Department (JBB)

# EXHIBIT G

## To Plaintiff's First Amended Verified Complaint

ALLIED PILOTS ASSOCIATION
Representing the pilots of American Airlines
O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

March 13, 2023

VIA ELECTRONIC MAIL ONLY

Captain Russ Moore
Vice President – Flight Ops
American Airlines, Inc.
P. O. Box 619617 MD851
DFW Airport, TX 75261-9617

Re: Conversion of DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance No. 23-031

Dear Captain Moore:

On May 22, 2012, the DFW Domicile Representatives filed Grievance No. 12-012 protesting the Company's violation of Sections 11.D, Supplement F(1), all other related sections of the Agreement, and past practice for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years. The Initial Hearing was waived, and the grievance is pending at the Vice President - Flight Appeal Hearing level.

The APA hereby converts DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance No. 23-031. In accordance with Agreement Section 21.D.3., I hereby submit this grievance directly to the System Board of Adjustment. Moreover, I respectfully demand expedited arbitration of this grievance in accordance with Agreement Section 23.

I request that the Company send a copy of all hearing notices and decisions relating to this grievance to the undersigned and the Legal Department, Allied Pilots Association, 14600 Trinity Blvd., Suite 500, Fort Worth, Texas 76155-2512.

Sincerely,

Captain Edward F. Sicher
President

cc: APA National Officers and Board of Directors
Captain John Owens, Chair, APA Negotiating Committee
Captain Jason Saxer, Chair, APA Contract Compliance Committee
Captain Tracy Parrella, Chair, Grievance Resolution Committee Ad Hoc
Captain BJ West, Member, Negotiating Committee
APA Legal Department (TEK/GD/JK)
Miranda Rosenthal, Esq., Managing Director Labor Relations (via Michelle Montgomery)
Ms. Michelle Montgomery, Senior Manager Labor Relations

# <u>EXHIBIT H</u>

## <u>To Plaintiff's First Amended Verified Complaint</u>

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**LAWRENCE M. MEADOWS,**
Plaintiff,

v.

**ALLIED PILOTS ASSOCIATION, et al.,**
Defendants.

**CASE NO. 17-cv-22589-EA**
**Honorable Judge Ed Artau**
______________________________/

**DECLARATION OF CAPTAIN EDWARD F. SICHER**

I, Captain Edward F. Sicher, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am over the age of eighteen and all statements made herein are true and correct to the best of my knowledge.

2. I am a veteran who served over 20-years as a U.S. Air Force Officer, am a decorated combat fighter pilot, who retired at the rank of Lt. Colonel, and was hired as a pilot for American Airlines in 1998, where I've worked for over 27 years, and am currently a B-777 Captain (CA) flying intentional routes.

3. During my military career I was disabled and grounded from flying to due to being temporarily paralyzed as the result of a vaccine reaction during Desert Storm. My wife was pregnant with my first-born at the time and the Air Force threatened me with removal. Thus, I have experienced first-hand what it means to be a long-term disabled (LTD) pilot who has lost their flying career and suffered the associated difficulties and long fight to get medically re-certified and return to the cockpit. This is a primary reason why I am a staunch advocate for American Airline's LTD and MDD (Medical Disabled Dropped from AA seniority list) pilots.

4. I devoted over a decade of my 27+ year career at American Airlines (AA) as a volunteer and elected representative at the American Airlines Pilots' union, the Allied Pilots Association (APA) which serves the 16000+ pilots of American Airlines, serving both at the Miami domicile and national level. Some of my many involvements in the pilot union include serving as the Miami (MIA) domicile Contract Compliance Chair (CH), as a MIA domicile Strike Preparedness Committee member, as an elected MIA domicile base representative (three times as the Miami Domicile Vice Chair (VC) and one time as the MIA Domicile Chair), at the national level as one of APA's Board of Directors (BOD), and finally as the elected President of the Allied Pilots Association 16000+ pilots where I had the privilege of representing the world's largest independent pilots' union at a unique time while we negotiated our most recent Contractual Bargaining Agreement (CBA).

5. As President, and in keeping with my commitment to more aggressively represent our disabled pilots, I formed several ad hoc committees to advocate for them, as is my right as President to do. I also expanded our outreach programs to our over 800 disabled pilots who were then on disability. I also hired additional outside legal advisors specialized in this area to help us more forcefully and properly advocate for our disabled pilots. I also spoke directly to American Airline's CEO Robert Isom, Chief Strategist and founding member Steve Johnson, and Chief Legal Counsel, Lucretia Guia, specifically about this issue and Larry Meadows.

6. In August 2023, as APA President, I obtained what was at that time the most lucrative pilots' collective barging agreement ever in the history of the airline-labor collective bargaining, adding an estimated additional $9.6 billion of contractual improvements over five years to our CBA to include amongst other things, industry leading pilot long-term disability (LTD) benefits.

7. As an APA BOD member and National Officer, I routinely communicated union business via text message and signal (during contract negotiations) on my personal electronic devices, with other APA members, committeemen, officers, and attorneys. I also primarily used my APA email hosted on APA servers, to which I was denied access after I left office.

8. Based on my extensive and longstanding union experience listed above, and for the reasons stated below, I am considered to be one of the foremost subject matter experts (SME) on the AA-APA's most recent collective bargaining agreement (CBA), the arguments and positions at the table which resulted in the gains we made and the items we were denied, American Airline's pilot union representation, APA's governance, and American's disabled pilots' LTD benefits and MDD pilots grievances, and associated statutes of the Railway Labor Act (RLA), Labor Management Reporting and Disclosure Act (LMRDA), Americans' with Disabilities Act (ADA), and the National Mediation Board (NMB), all of which I had to know and navigate as President of the labor association during this critical time.

9. On or around 2014 while serving my first term as MIA domicile's VC, I first met the Plaintiff, First Officer (FO) Lawrence Meadows, who was a disabled MIA pilot on LTD and MDD. As FO Meadow's local union representative I was given responsibility for the LTD and MDD issue by then MIA CH CA Thomas Copeland. FO Meadows engaged in significant protected activity, as a whistleblower, and an outspoken advocate for his fellow LTD and MDD union brothers and sisters, who were openly critical of their representation by APA during 2007-2011 time period for reasons which I will explain.

10. This was a particularly critical time for the MDD pilots due to the fact that AA had recently declared bankruptcy and was in the process of merging with US Air, leaving in doubt these pilots' positions on the new combined seniority list with the US Air Pilots and the America West Pilots,

if any position at all, should these pilots ever regain their medicals and be reinstated. It also left in question the status of the MDD pilots' many pending grievances such as DFW Domicile Grievance 20-012 (see attachments) over wrongful termination. Finally, it was also an increasingly unpopular topic to breach at the board table during the intensive merger negotiations as it increasingly appeared that APA had failed in achieving one of its most fundamental objectives and one which is sought by every labor union; the protection of it's members employment. It appeared that APA was complicit in allowing AA management to selectively choose which pilots it wanted to reinstate and which they did not (the company claiming that these pilots were "administratively removed"), while simultaneously allowing others to be reinstated. There was never any contractual provision for removal from employment for this reason nor was any proper notice given to these pilots. It also appeared to me that all of the pilots who were being refused reinstatement, at least all of them that I could identify, were those pilots that chose to fight AA in court instead of accepting AA management's decisions regarding their status and benefits without question. This disparate treatment appeared to be retaliation by the company and I was adamant that our union should be strongly advocating for each and every one of them.

11. In 2016, while serving as the MIA VC, and in an effort to get our union more aligned with the objective of reinstating our MDD pilots, I proposed a Resolution (R2016-30; see attachments) which sought to more clearly define our official union policy towards these MDD pilots and expedite the grievances which had been filed seeking their reinstatement to the seniority list. Although the legislation eventually passed, I was personally surprised at the push-back from APA's legal department. The only reason this legislation passed, after more than a year of deliberation by the BOD and objection by APA In-House Legal, was that President Dan Carey

had recently won the election for President of APA and summarily replaced the long-standing General Counsel of the union, Ed James from James and Hoffman, with Mr. George Buckley. Mr. Buckley had a fresh perspective and was willing to put the union on the right side of the issue. Also, at or about this time, long-serving Chief In-House Legal Counsel, Mr. Bennett Boggess, was replaced. Mr. Boggess had been the catalyst in allowing the company to pick and choose which pilots they chose to reinstate instead of advocating equally for all of them. Once he was gone progress towards getting APA to advocate for it's disabled members could begin

12. In performing my due-diligence in preparing Resolution R2016-30 for debate, I talked via telephone with American Airline's Director of Flight Administration, Mr. Scott Hanson, on whether I could expect his support on reinstating the MDD pilots to the seniority list, and he replied "Absolutely not". When I inquired as to why he replied, "Because I have a business to run". It was then I realized that I was going to fight a mostly uphill battle in the next several years to make any progress at all on this issue.

13. Also in researching this issue, I interviewed prior APA President Lloyd Hill, another MIA domicile member who served as national President from approximately 2008 until 2010. He and I discussed, amongst other issues, the hiring of an ERISA counsel in the 2008 to help APA fight this battle but then the union soon dismissed the counsel. When asked directly why this issue was abandoned Lloyd remarked that the union was in an increasingly precarious financial situation in the late 2000's and difficult decisions had to made concerning APA's expenses. For this reason he chose to concentrate APA's resources on those pilots still on the seniority list. Lloyd Hill, not coincidentally, was also the President who chose to reinstate Bennett Boggess as Chief In-House Legal counsel after he was fired in the mid-2000's.

14. On May 14 2012, and before I took my seat on the APA BOD, APA filed a collective LTD MDD Pilot seniority reinstatement grievance, DFW Domicile Grievance 12-012; "protesting the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of termination prior to terminating employment status of pilots who have been in inactive status, unpaid sick, or disability for more than five years." (Grievance 12-012 is attached as an exhibit). This grievance was fortunately preserved through the bankruptcy proceedings and still on the books when I started as a BOD member in 2014 (See attachment preserving the grievance through the bankruptcy). Unfortunately, American Airlines did not want to hear the grievance and therefore, with APA's complicity, continually pushed back on the hearing of the grievance for almost a decade. The union allowed the continual dismissal of the hearing and arbitration of this grievance until I became President and put additional resources and emphasis into the closure on this issue, rolling it into an expedited Presidential Grievance (G2023-31). A copy of Grievance 12-012 and it Sicher Presidential Expedited version 23-031 1 is attached hereto as **Exhibits A and B.**

15. Of noticeable importance during the 2014-2016 timeframe when I was starting my elective service to APA, was that the three pilot groups merging into the new American Airlines (Legacy American Airlines pilots, US Air pilots, and America West pilots) were all being treated in disparate manners in the forming of the new combined seniority list integration (SLI). Legacy AA Pilots were sometimes being denied reinstatement after 5-years off of the seniority list for an LTD condition, US Air Pilots were allowed to retain their position on the merged seniority list despite not possessing a current FAA medical until mandatory retirement age of 65, and America West pilots were removed without any provision to regain their seniority after 8-years LTD.

16. APA had chosen to lockout the MDD pilots from the social media and chat platforms of the union at the time so getting the membership and other board members to hear all sides of the story was increasingly difficult. As the Miami VC with responsibility for the LTD/MDD issue in MIA, I was Kathy Emery's representative in her objections to the unions lock-out of her ability to access the social media platforms. With the new General Counsel in place we soon reached agreement on a settlement for Emery's lock out. Unfortunately, the agreement, although getting Kathy an undisclosed settlement, did not include the other LTD pilots who were likewise locked out. I did not consider this a victory. A copy of AUD Newsletter and *Emery* v. APA Court Order and is attached hereto as **Exhibits C and D.**

17. Also, of interest during the timeframe that I worked to get APA to change it's position on the MDD pilots and was attempting to achieve passage of R2016-30, work was done behind the scenes by APA Attorney Mark Meyers, Director of Negotiations, and unknown to those on the Board of Directors such as myself. Myers solicited the legal opinion of an outside law firm, Babbs-Denison. This law firm issued a legal opinion letter justifying APA's abandonment of its MDD pilots (Babbs-Dennison legal opinion letter attached). However, this opinion was based on the information that had been provided to them by Myers, and it was later discovered during my representation of another MDD pilot, Wallace Preitz, that Babbs-Dennison was never provided with the key piece of information being that APA had previously filed multiple grievances on behalf of these pilots seeking their reinstatement and protesting their wrongful termination, thus giving these pilots "rays of hope" that the union would advocate for them. I believe that there is various case-law deliberating on this very issue and stating that by establishing these "rays of hope", the union had, "by default", established a Duty of Fair Representation (DFR), although I am no longer in possession of my electronic notes kept on APA

servers regarding this issue, I believe this letter, as flawed as it was, was used to justify the APA's Legal Department abandonment of the representation of these MDD pilots. Furthermore, the Babbs-Dennison legal opinion letter stated that although APA did not owe these pilots a duty of fair representation (DFR), a duty would be in order if action or representation was taken on behalf of any one of them, hence the importance of reporting the grievances that APA had filed when soliciting Babbs-Dennison for an opinion. A copy of Babb-Dennison legal opinion is attached hereto as **Exhibit E.**

18. Immediately after receiving the Babbs-Dennison letter, APA legal switched from obstructing my Resolution R2016-30, to reluctantly allowing its passage. On December 13, 2026, the APA Board of Directors ("BOD") voted in 19-3 to approve R2016-30 which stated in part;

> "the three separate contracts prior to the merger of US Air East, America West, and American Airlines **treated disability retirements differently**...the American Airlines contract, which has been subjectively reinterpreted by the Company to allow the removal of a pilot from the seniority list after five (5) years of continuous disability...**the merging of the seniority lists is creating a disparate treatment amongst the individual pilot groups**...the most beneficial treatment of all of our disabled pilots is **to allow them reinstatement from long-term disability in as expeditious and fair a manner as possible**... there has been some evidence indicating that the **company has unfairly withheld reinstatement to long-term disabled pilots** who have regained their Class A medicals from being reinstated if they were **considered problematic employees..."**... [Emphasis Added].

And further created a BOD directive to the APA negotiating committee, which stated;

> ***BE IT RESOLVED, that the Negotiating Committee expeditiously engage the company in negotiations which seek to: 3. Negotiate contractual language that provides for the immediate reinstatement and return to the Pilot System Seniority List of all pilots who are currently out sick or on disability and who have been removed from the seniority list...*** [Emphasis Added].

A copy of APA BOD Resolution 2016-30 is attached hereto as **Exhibit F.**

19. During the January 2020 investigation of the MDD issue (and before I was President of the union but serving as the MIA domicile CH and BOD Member), the committee I chaired interviewed two APA attorneys, Director of Negotiations Mark Myers, and APA Director of Representation, James Clark, who both made material misstatements of the facts with respect to the existence of the legal department's secret December 12, 2016, Babb-Denison legal opinion letter obtained without knowledge or authorization from APA's Board of Directors, which appeared to be used as justification of APA legal's prior abandonment of the duty of representation of the over 240 MDD pilots; to include, improperly excluding them from their full share payout of the $1.1B Equity Distribution, estimated to be approximately $100,000.00 per MDD pilot, or $24M collectively. I informed then President Ferguson of these attorney's ethical violations and recommended they be terminated due to ethics violations of the APA Constitution and Bylaws (C&B"), but he declined, stating he "must safeguard the best interests of APA", and instead abruptly disbanded the committee before it could issue its findings. I therefore re-started the committee up as an ad-hoc committee immediately upon my winning of the Presidential election, this time under a different name. See Deposition transcript of Edward Sicher in; *Preitz v. APA* (Case No. 2:17-cv-01166-MSG, Doc 107-4, Jan 6, 2021) stating both Mr. Myers and Clark both lied about Babb-Denison letter).

20. In or around April 2022, while serving as the Miami Domicile representative, I appointed FO Meadows to the APA National Aeromedical Committee, Disabled Pilots Awareness Sub-Committee (DPASC), to serve as the MIA Domicile Pilot LTD Coordinator to assist other disabled pilots. The APA legal department pushed back on this appointment, arguing that FO Meadows was not a "member in good standing" and was therefore ineligible to serve on a national committee. This disagreement boiled out in my issuance of a Presidential

Interpretation on Sep 2, 2022, defining "members in good standing" (The APA President is the only union official allowed to interpret the Constitution and By-Laws at APA).

21. The formal Constitutional Interpretation (see attachment) confirmed that inactive members, including MDD pilots, like FO Meadows, who had fulfilled all prior membership requirements, were "members in good standing." And could certainly serve on APA committees and in official APA capacities. A copy of that Presidential interpretation is attached hereto as **Exhibit G.**

22. As a direct result of my Constitutional Interpretation FO Meadows, as a member in good standing, was able to serve as the MIA Domicile LTD Coordinator, where he sponsored and helped scores of disabled pilots.

23. As APA President, I also took steps to address FO Meadows' long-pending individual and collective seniority reinstatement grievances. On March 13, 2023, at FO Meadows request, I converted the collective Grievance 12-012 into expedited Presidential Grievance 23-031. A copy of G-23-031 is previously attached as **Exhibit B.**

24. I also created the National Dropped Reinstatement ad hoc Committee ("NDRC"), and around April 2023, I appointed First Officer ("FO") Thomas Rempfer as Chairman, to ensure that APA leaves "no pilot behind". The NDRC was tasked with finding avenues of reinstatement for those who have been dropped from the seniority list, by virtue of disability, merger, or other reason, not including retirement or discipline. This was intended to help obtain reinstatement of FO Meadows and other similarly situated MDD pilots. A copy of the NDRC power point presentation that FO Rempfer created in collaboration with MDD pilots FOs Meadows and Preitz is attached hereto as **Exhibit H.**

25. During the AOA Spring BOD Meeting, FO Rempfer presented the NDRC PowerPoint to the BOD, and APA Attorney Tricia Kennedy and Former APA BOD CA Thomas Westbrook attempted to orchestrate a recall of MDD advocate FO Rempfer. A copy of FO Rempfer's Memo For Record is attached hereto as **Exhibit I.**

26. In early 2024, and due to the fact that it increasingly appeared that AA was unwilling to reinstate Larry Meadows without a legal fight, I hired attorney Sue Edwards, Esq., to personally represent FO Meadows in his individually filed ADA lawsuit against American Airlines. The objective was to put a set of professional eyes on Meadow's filings as he had up to then primarily been representing himself pro-se. Sue Edwards was trusted by the MDD pilots and had recently achieved a win for APA in a prior lawsuit against the FAA for the wrongful termination of one of our pilots for being improperly notified of a drug test. I felt that to truly succeed in court he would need professional guidance. Victory in court would hopefully persuade AA to drop its obstruction to reinstating our MDD pilots and result in the mutually beneficial outcome to both our pilots and the company. As President and the primary fiduciary of the APA, the reason I gave to the Board of Directors and legal counsel for this expenditure was that I had reached an agreement with Meadows that he would drop the lawsuits against APA if the union put the bulk of its collective resources behind what was increasingly becoming an individual fight. Meadows had originally agreed to this "quid pro quo", but when it became clear to him that he would have to drop his claims against APA before he would receive surety that his claims for reinstatement as a pilot against AA would succeed he reneged and declined to drop his claims against APA. When this occurred I directed Ms. Edwards to terminate her representation of Meadows.

27. Furthermore, on or about June 13, 2024, I directed the APA Director Of Grievances, Tricia Kennedy, to move FO Meadows' individual Grievance 12-011 forward and schedule it for an arbitration hearing. To my knowledge, that grievance was still open, active, and in the queue for a an arbitration hearing at least until I left office on October of 2024. Text messages between myself and Tom Remper attached hereto as **Exhibit J.**

28. On or around late September 2024, I was presented with a proposed settlement agreement with American Airlines concerning Grievances 12-012 and 23-031. That proposal would have reinstated several other MDD pilots, some out on disability for much as 24-years, but explicitly excluded FO Meadows, despite the fact he was holding an FAA Airman's First Class Medical Certificate and working as current and qualified B-777 Captain and Instructor pilot in Boeings Miami Flight Training Center. I refused to sign because it was a "go-no-go decision point" to leave any pilot behind. I truly felt that to have continued the fight to this point and finally settle by letting the company decide who to reinstate and who to refuse would have left this issue unresolved, thus resulting in returning right back to where we started.

29. In late 2024 and after an internal battle with my Board of Directors over the possible merger of our union with the Air Line Pilots Association (ALPA), a merger which I was adamantly against, I was removed from office by the Board of Directors. The Board of Directors was able to install another President they were allowed to choose due to the short remaining time left on my tenure. The replacement they chose, FO Nick Silva, had never served in a membership elected position and had very little experience, particularly dealing with APA grievances or its legal department. He had only served as a costing analyst on the negotiating committee. He summoned me down to APA to discuss the handoff from one President to the next. Despite the fact that there were hundreds of issues in play at the time, such as staff issues,

IT upgrades. problems with AA's Safety program and the FAA oversight of the airline, etc. etc. all Nick wanted to discuss was the issue of Larry Meadows. This was a huge surprise to me and indicative of how much pressure he was under by the APA legal department to fold on APA's advocacy for Meadows and the grievances I had filed as President. The question he dwelled on for most of the 45' he had scheduled for me was "Why wouldn't you approve the proposed MDD settlement by removing Larry Meadows?"

30. I have since learned that on January 15, 2025, the new APA President FO Silva executed a settlement that finalized the exclusion of FO Meadows and falsely claimed that his individual Grievance 12-011, the very same grievance I had ordered to arbitration months earlier, was now being declared "closed since 2013." A copy of this January 15, 2025 Grievance 12-012/23-031 Settlement are attached hereto as **Exhibit K.**

31. I have also been informed by FO Meadows that on or around May 1, 2025, the current APA President Nick Silva, terminated Meadows 34-years of APA membership via a letter, in response his request to speak during membership guest hour at the 2025 Spring Board of Directors Meeting. A copy of this correspondence is attached hereto as **Exhibit L.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of January, 2026.

Captain Edward F. Sicher
MIA/777/International

# <u>EXHIBIT I</u>

## <u>To Plaintiff's First Amended Verified Complaint</u>

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**LAWRENCE MEADOWS,**
**Plaintiff,**

**v.**

**ALLIED PILOTS ASSOCIATION,**
**Defendant.**

**CASE NO. 1:17-cv-22589-EA**
**HONORABLE JUDGE ED ARTAU**
_________________________________/

**SUPPLEMENTAL DECLARATION OF CAPTAIN EDWARD F. SICHER**

I, Captain Edward F. Sicher, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the former President of the Allied Pilots Association ("APA") and APA Board of Directors, having served from 2014 until October 2024. I submit this supplemental declaration based on my personal knowledge to provide further information regarding ESI preservation at APA and APA's retention of counsel for Lawrence Meadows.

2. I have no recollection of, nor any document to corroborate the fact, that at anytime during my service as an APA National Officer starting in 2014, as an APA Board Member, or while serving as the APA National President, I was ever notified by APA's Legal Department of a "litigation hold" in the matter of *Meadows v. APA*. I was never instructed by APA counsel to preserve my emails, text messages, or other ESI related to my union duties with respect to Mr. Meadows, nor did I receive a litigation hold letter related to Mr. Meadows until months after I had left office in 2024, despite being notified by the Plaintiff that he sent preservation letters to APA as early as 2013.

3. Because I was under no instruction from APA to preserve such communications, I routinely deleted text messages from my personal devices during my tenure as President.

4. Shortly after I was removed from office in October 2024, my APA-issued laptop became inoperable. When I brought the laptop to APA headquarters to be serviced, the hard drive was effectively wiped clean, rendering all stored data, including emails and documents related to my duties as APA President, permanently inaccessible to me from that device. Thus, almost all of the electronic documents generated during the time of my Presidency, if they still exist, reside on APA's servers which I was obligated use in the performance of my official duties.

5. As APA President, I authorized and recall signing several payments for outside legal counsel to represent Mr. Meadows. Specifically, on or around May 2024, I signed an Authorization for Expenditure ("AFE") for a retainer to be paid to attorney Sue Edwards, Esq., for her individual representation of Mr. Meadows in connection with his disability discrimination claims against American Airlines.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this 29th day of January, 2026.

Captain Edward F. Sicher

# EXHIBIT J

## To Plaintiff's First Amended Verified Complaint

**SETTLEMENT AGREEMENT**

**Between**

**AMERICAN AIRLINES, INC.**

**and the**

**ALLIED PILOTS ASSOCIATION**

American Airlines, Inc., including its subsidiaries, affiliates, and parent companies, (collectively "American" or "Company"), and the Allied Pilots Association ("APA" or "Union") (collectively referred to as the "Parties"), mutually desire to settle and resolve Sicher Expedited Presidential Grievance 23-031 (converted from DFW Domicile Grievance No. 12-012). Accordingly, the Parties hereby agree to the following terms to compromise, settle, fully and finally resolve Sicher Expedited Presidential Grievance 23-031, including the underlying DFW Domicile Grievance No. 12-012, in its entirety, as follows:

WHEREAS, on May 22, 2012, the APA DFW Domicile Representatives filed Grievance No. 12-012 protesting the Company's alleged violation of the 2003 Collectively Bargained Agreement for failing to provide pilots notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five (5) years; and

WHEREAS, on March 13, 2023, the APA converted the DFW Domicile Grievance No. 12-012 into Sicher Expedited Presidential Grievance 23-031 (collectively with DFW Domicile Grievance No. 12-012, the "Presidential Grievance"). The Presidential Grievance continued to protest the Company's alleged violation of the Collectively Bargained Agreement for failing to provide pilot notice of termination prior to terminating the employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years; and

WHEREAS, in the Presidential Grievance the APA contended that the Company's failure to provide notice to pilots of their impending removal from the seniority list and separation from employment precluded those pilots from either attempting to return to service prior to being dropped from the seniority list and separated from their employment, and/or filing a grievance challenging the Company's decision to drop them from the seniority list and separate them from employment; and

WHEREAS, the remedy sought in the Presidential Grievance was an award ordering the Company to provide affected individuals with notice of their removal from the seniority list and separation from service thereby allowing them to then file a grievance challenging that action based upon the facts that existed at the time the original notice should have been given; and

WHEREAS, the Company contends the APA may not convert a domicile grievance into a presidential grievance and the APA disagrees with same;

WHEREAS, the Company contends the Presidential Grievance is without merit; and

WHEREAS, the Parties conducted a mediation on November 7, 2024, before a Neutral, and

through subsequent discussions, reached an agreement to resolve the Presidential Grievance; and

WHEREAS, the Parties desire to avoid further controversy and fully settle and compromise the Presidential Grievance, without any further proceedings.

NOW, THEREFORE, in exchange for the mutual considerations described herein, the sufficiency of which is hereby acknowledged, the Parties agree to fully resolve the Presidential Grievance, as follows:

1. Although no specific pilots are referenced in the Presidential Grievance or the underlying Domicile Grievance, the Parties have identified the following four (4) individuals who were on inactive status, unpaid sick, or disability for more than five years, were removed from the pilot seniority list and separated from employment with the Company, and have represented that they have since obtained, or have filed paperwork to obtain, an FAA First Class Medical Certificate, and expressed a desire to be reinstated to employment as a pilot with the Company: Timothy Curren (354581), Dale Churovich (354629), Lawrence Meadows (332713), and Roger Wagner (318588) (collectively the "Identified Individuals").

2. One of the Identified Individuals, however, Lawrence Meadows, was provided and received the notice attached as Exhibit A during his prior employment in advance of his removal from the seniority list and separation from employment in 2011, and the Parties agree that none of the other Identified Individuals received similar communications from the Company prior to their separation from employment. Following Mr. Meadows' removal from the seniority list and separation from employment, he filed two grievances challenging the Company's actions. The Company disputes that the notice given was required by the CBA while the APA contends that the notice was required and that the provided notice may not have been compliant in form. However, the APA has concluded that, under the totality of circumstances of this case, it is unlikely to prevail on its argument before the System Board, particularly in light of the fact that Mr. Meadows filed Grievance 12-011 and Grievance 13-064 challenging the Company's decision to separate him from employment at the time. Both grievance 12-011 and 13-064 were subsequently disposed of and closed after the APA declined to advance them in 2013 and 2014, respectively. As a result, Mr. Meadows is deemed not to be an Eligible Individual under this Agreement, and thus, he is not eligible for reinstatement under this Agreement.

3. Based on the Parties' knowledge, Timothy Curren (354581), Dale Churovich (354629), and Roger Wagner (318588) (collectively "Eligible Individuals") did not receive notice prior to their removal from the seniority list and separation from employment and did not file a grievance challenging the Company's actions at the time. The Eligible Individuals may elect to utilize the process detailed below for possible reinstatement to the Pilot Seniority List and return to employment and active status at the Company, provided they satisfy the conditions detailed below.

4. The Parties agree to offer a one-time opportunity to the Eligible Individuals to utilize the following process for possible reinstatement to the Pilot Seniority List and return to

employment with the Company (the "Process for Possible Reinstatement"). The Process for Possible Reinstatement must commence within thirty (30) days of the full execution of this Settlement Agreement. Each Eligible Individual may elect to pursue or may decline to pursue this one-time opportunity to pursue the Process for Possible Reinstatement as described below.

a. The APA will provide each Eligible Individual with the terms of the Process for Possible Reinstatement and advise them of their right to opt into pursuing reinstatement through the Process for Possible Reinstatement and that, regardless of whether they seek reinstatement, the Presidential Grievance will be withdrawn with prejudice pursuant to this Agreement. In the event an Eligible Individual does not timely and properly opt to pursue the Process for Possible Reinstatement, then the Eligible Individual will have waived his right to pursue the Process for Possible Reinstatement and will have elected not to return to employment with the Company and the APA will not advance any subsequent request for reinstatement, reemployment, or rehire on their behalf.

5. Process for Possible Reinstatement. The Parties agree the following steps comprise the Process for Possible Reinstatement for the Eligible Individuals:

a. **Step 1**: In the event an Eligible Individual opts to pursue the Process for Possible Reinstatement, the Eligible Individual must send an email to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org) so indicating no later than thirty (30) consecutive calendar days after the date this Settlement Agreement is fully executed. The Eligible Individual must include a true and correct copy of his First Class Medical Certificate along with the email.

b. **Step 2**: Within 14 days of providing the Notice in Step 1, the Eligible Individual must execute a General Release (attached as Exhibit B) and email it to Maranda Rosenthal (maranda.rosenthal@aa.com) and Jim Clark (jclark@alliedpilots.org).

c. **Step 3**: The Eligible Individual shall submit to and successfully clear the standard pre-employment background checks for American pilots, including PRIA records review, submission to the Rap Back Program, fingerprinting, drug and alcohol testing, and any other standard, pre-employment requirement for New Hire American pilots.

d. **Step 4**: The Eligible Individual shall execute and submit a request to the FAA for a complete copy of their medical file (commonly referred to as a "Blue Ribbon File") to be released and sent to Natasha Narayan, MD, American's Corporate Medical Director. Dr. Narayan will review the Blue Ribbon File received from the FAA. Dr. Narayan shall have twenty (20) days to review the file upon receipt of same. In the event American's Corporate Medical Director concludes that the Blue Ribbon File is complete and accurate on its face, the Company will accept the determination rendered by the FAA in granting the medical certificate.

In the event American's Corporate Medical Director determines that the Blue Ribbon File indicates a need for further information or clarification in order for the Eligible Individual to continue on the Process for Possible Reinstatement, the Company will notify the Eligible Individual and APA in writing and identify the information/clarification needed. The criteria used in determining whether further information/clarification is necessary will be limited to: (a) suspected non-disclosure of material information; (b) evidence of non-compliance with an established treatment plan, (c) a prescribed treatment plan being inconsistent with a diagnosis or evaluation, or (d) clearance reports from a physician or specialist whose credentials are not consistent with the reported diagnosis. The Eligible Individual will then have the opportunity to provide additional information/clarification in response to the item(s) identified by the Medical Director.

Within ten (10) days of receipt of a response from the Eligible Individual, the Company will notify the Eligible Individual and APA in writing if additional information/clarification is needed and detail the basis for such determination. The Eligible Individual will be given an opportunity to withdraw their reinstatement request in writing to both the Company and the APA within ten (10) days of receipt of notification. If the Eligible Individual elects to withdraw their reinstatement request, then the Company will not take any further action. If the Eligible Individual does not withdraw his request for reinstatement or affirmatively confirms in writing his intention to continue with the reinstatement process under this Agreement, the Company shall copy the pilot on an email submission of Dr. Narayan's request for an FAA aeromedical general review at 9-AMC-GRCustomerSvc@faa.gov. An FAA request for information is not a denial. If the FAA denies the Eligible Individual's medical certificate, such Eligible Individual's reinstatement request shall be denied. If the FAA does not deny the Eligible Individual's medical certificate in response to the request for review, then the FAA determination on the medical certificate will be deemed final and binding with regard to reinstatement of the Eligible Individual.

If the Company seeks a general review of an Eligible Individual's medical certificate and the FAA confirms the medical certificate, the Eligible Individual will be entitled to be paid retroactive to the date the request for FAA general review was made at the hourly pay rate based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold. This period of retro pay will not be included in the 18-month guarantee provided in paragraph 6(b) below. In the event the FAA requests information directly from the Eligible Individual during the general review process, the period of time between when the request is made and when the Eligible Individual responds to the request will not be considered compensable in the event retroactive pay is required under this paragraph.

e. **Step 5**: If an Eligible Individual successfully completes Steps 1 through 4, he will be reinstated to employment with the Company and placed on the Pilot Seniority list at the number representing approximately where he would have

been had he remained continuously employed by the Company ("relative seniority"). Reinstatement will begin effective with the commencement of training.

f. **Step 6**: The Eligible Individual shall be assigned the first available training spot within three (3) months of the date reinstatement is approved, and will be given five (5) days' notice of same. The Eligible Individual will receive the standard AQP training course proffered to New Hire American pilots, inclusive of the standard remedial training offered to New Hire American pilots. Once the Eligible Individual successfully completes his training, he is considered an active employee and governed by the 2023 AA-APA Agreement and Company policies except as noted herein. In the event the Eligible Individual does not successfully complete training due to a training failure, he will not advance any further on the Process for Possible Reinstatement, and APA will not advance any subsequent request for reinstatement, reemployment, or rehire on his behalf.

6. The following terms apply to each Eligible Individual who successfully completes the Process for Possible Reinstatement ("Reinstated Pilot"):

a. Upon successful completion of training, each Reinstated Pilot shall be assigned as a First Officer on a narrow body aircraft until such time as the Reinstated Pilot has accomplished 1,000 hours of flight time as a narrowbody First Officer. After the completion of the required 1,000 hours of flight time, the Reinstated Pilot may exercise his seniority to bid for and be awarded whatever bid status his relative seniority can hold in the first vacancy bid award following completion. Prior to assigning the Reinstated Pilot a narrow body bid status, the Company shall confer with the Reinstated Pilot about his aircraft and base preferences and take such preferences into consideration when assigning the Reinstated Pilot a narrow body bid status.

b. Compensation will commence once the Eligible Individual successfully completes Steps 1 through 4 above and timely reports for training as directed and described in this Settlement Agreement. Regardless of what seat and equipment is being flown, the Reinstated Pilot's hourly pay rate will be based on the Equipment Pay Band (AA-APA Agreement Section 3) that his relative seniority will allow him to hold for the first 18 months of his reinstatement. At the conclusion of the first 18 months, the Reinstated Pilot will assume the pay rate associated with whatever bid status the Reinstated Pilot holds at that time.

c. Upon completion of training, the Reinstated Pilot's vacation bank and sick bank will reflect zero hours and will begin to accrue based upon the pilot's length of service in accordance with the 2023 Agreement. The Parties agree that the terms of LOA 18-001 do not apply to the Eligible Individuals. The Parties agree that the Reinstated Pilot's length of service will reflect the following upon timely reporting for training at the Training Academy:

Timothy Curren (354581) – updated Class Date 1/20/2016 – 9 years

Dale Churovich (354629) – updated Class Date 1/29/2017 – 8 years
Roger Wagner (318588) – updated Class Date 2/16/2020 – 5 years

7. The Parties agree that the Eligible Individuals defined above cannot be changed, expanded, or modified in any way.

8. The APA agrees to immediately withdraw with prejudice the Presidential Grievance and is resolved on a no citation and no precedence setting basis.

9. This Agreement does not constitute an admission of any kind by the Company or the APA and is being entered into to avoid the expense and uncertainty of arbitrating the Presidential Grievance.

10. The Parties agree that this Agreement constitutes the complete agreement between the Parties concerning the Presidential Grievance and that no other representations or promises have been made by the Parties in that regard.

11. This Agreement may not be modified in any manner except in a writing signed by both Parties.

**ALLIED PILOTS ASSOCIATION**

By: ______________________
First Officer Nick Silva
President

Dated: January 15, 2025

**AMERICAN AIRLINES, INC.**

By: ______________________
Maranda Rosenthal
Managing Director, Labor Relations/Flight
Assoc. General Counsel

Dated: January 15, 2025

# EXHIBIT K

## To Plaintiff's First Amended Verified Complaint

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**LAWRENCE MEADOWS,**
Plaintiff,

v.

**ALLIED PILOTS ASSOCIATION, et al.,**
Defendants.

**CASE NO. 17-cv-22589-EA**
**HONORABLE JUDGE ED ARTAU**
_______________________________/

**SECOND SUPPLEMENTAL DECLARATION OF CAPTAIN EDWARD F. SICHER**

I, Captain Edward F. Sicher, declare and state as follows:

1. I am over the age of eighteen and am competent to make this declaration. The facts stated herein are based on my personal knowledge.

2. I previously submitted two sworn declarations in this matter, filed at ECF No. 180, Exhibit 3, and ECF No. 187, Exhibit 1. I have reviewed those declarations and re-affirm all statements made therein as true and correct.

3. I submit this supplemental declaration to correct certain factual errors in the Magistrate Judge's May 25, 2026 Report and Recommendation ("R&R") [ECF No. 269]. I have dedicated a decade of my career, from 2014 to 2024, to advocating on behalf of First Officer Meadows and similarly situated disabled pilots, first as his Miami Domicile Representative and later as APA President. My knowledge spans the entire period of this litigation, both within and beyond the Court's December 31, 2021 temporal scope limitation.

4. **Regarding Spoliation of Evidence:** The Magistrate's R&R recommends summary judgment on a record whose integrity is subject to a pending Motion for Sanctions for Spoliation [ECF No. 187]. As I stated in my prior declaration (ECF 187, Ex. 1) and re-affirm here, I was never placed on a litigation hold by APA's Legal Department during my entire tenure as President, and I was never instructed by APA counsel to preserve my emails text messages, or other ESI related to my union duties with respect to First Officer Meadows. Because of this failure, I routinely deleted my emails and text messages. Most egregiously, after I was removed from office, my APA-issued laptop was "effectively wiped clean" by APA staff.

5. In addition to my laptop, I was known for keeping copious contemporaneous handwritten notes on standard yellow legal pads regarding all aspects of my union duties. These notes amounted to hundreds of individual legal pads, which I stored in approximately five milk crates. Each pad was typically dated and labeled by topic, such as "Meadows Litigation" or matters related to the REDDI committee. I relied on these contemporaneous notes for accuracy, including during sworn deposition testimony in other litigation. As I was never instructed by APA's Legal Department to preserve these materials, I discarded and destroyed all five crates of these handwritten notes when cleaning out my garage after I was removed from office in late 2024.

6. **Regarding Fraud on the Court:** The R&R is predicated on a Protective Order that was procured by fraud. As I attested in my prior declarations (ECF 180, Ex. 3, ¶ 26; ECF 187, Ex. 1, ¶ 5), I have direct, personal knowledge that APA counsel John Pellettieri's representations to the Court that attorney Sue Edwards never represented First Officer

Meadows were false. I personally retained Ms. Edwards on behalf of APA to represent First Officer Meadows and authorized her retainer.

7. **Regarding Counts I & II (DFR - Seniority Integration):** The R&R's finding that APA's actions were reasonable is contradicted by the record. As I attested in my prior declaration (ECF 180, ¶ 18), I proffered APA Board of Directors Resolution R2016-30, which explicitly acknowledged that legacy American Airlines' Medically Disabled Dropped ("MDD") pilots suffered "disparate treatment" and were improperly removed from the seniority list due to the "subjective interpretation of the CBA", and that some were deemed "problematic employees" and unfairly denied reinstatement. This resolution documented the Board's acknowledgment of these issues during the ISL proceedings.

8. **Regarding Count III (DFR - Grievance 12-012):** The R&R's finding that Grievance 12-012 did not apply to First Officer Meadows is false. As I previously attested (ECF 180, ¶ 23), in March 2023, I converted Grievance 12-012 into Sicher Expedited Presidential Grievance 23-031 for the express purpose of advancing Meadows' claim, demonstrating that APA itself treated the grievance as applying to him.

9. **Regarding Counts IV & V (Breach of Contract):** The R&R's finding that these claims are preempted ignores APA's own, duplicitous legal position. As I previously attested (ECF 180, ¶ 19), I am aware that APA's Legal Department, relying on the secret "Babb-Denison" legal opinion based a false narrative, internally maintained that APA owed no statutory duty of fair representation ("DFR") to MDD pilots under the Railway Labor Act ("RLA").

10. **Regarding Counts VI & VII (LMRDA - Membership & Free Speech):** The R&R's reliance on the 2017 *Valverde* arbitration award is a clear error. As I previously

attested (ECF 180, ¶¶ 21-22), my official September 2, 2022, "Presidential Constitutional Interpretation, Inactive Member Standing" superseded that award and affirmed First Officer Meadows' status as a member in good standing, pursuant to which I appointed him to the APA National Aeromedical sub-committee to serve as the Miami Domicile's Long-term Disability Coordinator. I have firsthand knowledge that First Officer Meadows was previously permitted to speak at multiple Board of Directors meetings as a member in good standing. Following his request to speak and expose the secret settlement at the APA Spring 2025 Board of Directors Meeting, his membership was terminated by President Nick Silva on May 1, 2025.

11. **Regarding Count VIII (LMRDA - Retaliation):** The R&R's finding that this claim is barred is erroneous. It ignores new, independent acts of retaliation. As I attested in my prior declarations (ECF 180, ¶ 26; ECF 187-1, ¶ 5), I have personal knowledge that APA leadership pressured First Officer Meadows to drop this lawsuit, and his legal representation was terminated after he refused. Most egregiously, the pretext used in the January 15, 2025 Settlement Agreement was the deliberate falsehood that Grievance 12-011 was "closed since 2013," a fact I know to be false as I had personally directed that same grievance to be moved to arbitration in June 2024.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29 day of May, 2026.

Captain Edward F. Sicher